## COMMONWEALTH *vs.* JOHN HUNT & others.

The general rules of the common law, making conspiracy an indictable offence, had been used and approved in Massachusetts before the adoption of the constitution of the Commonwealth, and were continued in force by *c.* VI. § 6, of that instru-ment. *Aliter*, of the English laws regulating the settlement of paupers, the wages of laborers, and making it penal for any one to use a trade or handicraft to which he had not served a full apprenticeship.

To constitute an indictable conspiracy, there must be a combination of two or more persons, by some concerted action to accomplish some criminal or unlawful pur-pose; or to accomplish some purpose, not in itself criminal or unlawful, by crim-inal or unlawful means.

An association, the object of which is to adopt measures that have a tendency to im-poverish a person — that is, to diminish his gains and profits — is lawful or unlaw-ful, as the means, by which that object is to be effected, are lawful or unlawful.

An indictment for a conspiracy to compass or promote a criminal or unlawful purpose must set forth that purpose fully and clearly.

An indictment for a conspiracy to compass or promote a purpose, not in itself crim-inal or unlawful, by the use of criminal or unlawful means, must set forth the means intended to be used.

An indictment for a conspiracy, which does not directly aver facts sufficient to con-stitute the offence, is not aided by matter which precedes or follows the direct aver-ments; nor by qualifying epithets, (as "unlawful, deceitful, pernicious," &c.) at-tached to the facts averred.

An indictment alleged that the defendants, being journeymen boot-makers, unlawfully &c. confederated and formed themselves into a club, and agreed together not to work for any master boot-maker or other person, who should employ any journey-

man, or other workman, who should not be a member of said club, after notice given to such master or other person to discharge such workman. *Held,* that there was no sufficient averment of any unlawful purpose or means.

So of an indictment which alleged that the defendants, being journeymen boot makers, unlawfully &c. conspired, confederated, and agreed together not to work for any person who should employ any workman not being a member of a club, called the Journeymen Bootmakers' Society, or who should break any of their by- laws, unless such persons should pay to said club such sums as should be agreed upon as a penalty for the breach of such by-laws; and, by means of said con- spiracy, did compel one W., a master cordwainer, to turn out of his employ one H., a journeyman boot-maker, because said H would not pay a sum of money to said club for an alleged penalty of some of said by-laws.

So of an indictment which alleged that the defendants intending, unlawfully and by indirect means, to impoverish one H., a journeyman boot-maker, and hinder him from following his trade, did unlawfully conspire, &c. by wrongful and indirect means to impoverish him, and to deprive and hinder him from following his trade of journeyman boot-maker, and from getting his livelihood and support thereby; and, in pursuance of said conspiracy they did unlawfully, &c. prevent him from following said trade, and did greatly impoverish him.

So of an indictment which alleged that the defendants, designing to injure one W. and divers others, all being master boot-makers, employing journeymen, unlaw- fully, &c. did conspire and agree together by indirect means to prejudice and im poverish one W. and divers others, all being master cordwainers and employing journeymen boot-makers, and to hinder them from employing any journeymen who should not, after notice, become members of a club, called the Journeymen Boot- makers' Society, or who should break or violate any of the by-laws of said club, or refuse or neglect to pay any sum of money, demanded from them by said club, as a penalty for such breach of said by-laws.

THIS was an indictment against the defendants, (seven in number,) for a conspiracy. The first count alleged that the defendants, together with divers other persons unknown to the grand jurors, " on the first Monday of September 1840, at Boston, being workmen and journeymen in the art and manual occupation of boot-makers, unlawfully, perniciously and deceit- fully designing and intending to continue, keep up, form, and unite themselves into an unlawful club, society and combination, and make unlawful by-laws, rules and orders among themselves, and thereby govern themselves and other workmen in said art, and unlawfully and unjustly to extort great sums of money by means thereof, did unlawfully assemble and meet together, and, being so assembled, did then and there unjustly and corruptly combine, confederate and agree together, that none of them should thereafter, and that none of them would, work for any

master or person whatsoever, in the said art, mystery or occupation, who should employ any workman or journeyman, or other person, in the said art, who was not a member of said club, society or combination, after notice given him to discharge such workman from the employ of such master ; to the great damage and oppression, not only of their said masters employing them in said art and occupation, but also of divers other workmen and journeymen in the said art, mystery and occupation ; to the evil example of all others in like case offending, and against the peace and dignity of the Commonwealth."

The second count charged that the defendants, and others unknown, at the time and place mentioned in the first count, " did unlawfully assemble, meet, conspire, confederate and agree together, not to work for any master or person who should employ any workman not being a member of a club, society or combination, called the Boston Journeymen Bootmakers' Society in Boston, in Massachusetts, or who should break any of their by-laws, unless such workman should pay to said club and society such sum as should be agreed upon as a penalty for the breach of such unlawful rules, orders and by-laws ; and by means of said conspiracy, they did compel one Isaac B. Wait, a master cordwainer in said Boston, to turn out of his employ one Jeremiah Horne, a journeyman boot-maker, because said Horne would not pay a sum of money to said society for an alleged penalty of some of said unjust rules, orders and by-laws."

The third count averred that the defendants and others unknown, " wickedly and unjustly intending unlawfully, and by indirect means, to impoverish one Jeremiah Horne, a journeyman boot-maker, and hinder him from following his trade, did " (at the time and place mentioned in the former counts) " unlawfully conspire, combine, confederate and agree together, by wrongful and indirect means to impoverish said Horne, and to deprive and hinder him from following his said art and trade of a journeyman boot-maker, and from getting his livelihood and support thereby ; and in pursuance of said conspiracy, they did wrongfully, unlawfully and indirectly prevent him, the said

10 *

Horne, from following his said art, occupation, trade and busi ness, and did greatly impoverish him."

In the fourth count it was alleged that the defendants, (at the time and place before · mentioned) " unjustly intending to injure and impoverish one Jeremiah Horne, and to deprive him of work and employment, and to prevent his earning a livelihood and support by following his trade of a journeyman boot-maker, did unlawfully conspire, combine, confederate and agree to-gether, by indirect means wrongfully to prejudice the said Horne and prevent him from exercising his trade as a journeyman boot-maker, and impoverish him."

The fifth count set forth, that the defendants, at Boston, on the first Monday of November 1839, "unlawfully, designedly to prejudice and impoverish one Isaac B. Wait, one Elias P. Blanchard, one David Howard, and divers other persons, whose names to the jurors are not known, all being master cordwainers and boot-makers in said Boston, employing journeymen boot makers, did unlawfully, wrongfully and corruptly conspire, com bine, confederate and agree together, by indirect means unjustly to prejudice and impoverish said Wait, Blanchard, Howard, and said other master cordwainers, whose names are unknown as aforesaid, and to prevent and hinder them from employing any journeymen boot-makers, who would not, after being noti-fied, become members of a ·certain club, society or combination, called the Boston Journeymen Bootmakers' Society in Boston, Massachusetts, or who should break or violate any of the rules, orders or by-laws of said society, or refuse or neglect to pay any sum of money demanded from them, by said society, as a penalty for such breach of said by-laws."

The defendants were found guilty, at the October term, 1840, of the municipal court, and thereupon several exceptions were alleged by them to the ruling of the judge at the trial. The only exception, which was considered in this court, was this : " The defendants' counsel contended that the indictment did not set forth any agreement to do a criminal act, or to do any lawful act by criminal means ; and that the agreements, therein set forth, did not constitute a conspiracy indictable by any law of

this Commonwealth; and they moved the court so to instruct the jury: But the judge refused so to do, and instructed the jury that the indictment against the defendants did, in his opinion, describe a confederacy among the defendants to do an unlawful act, and to effect the same by unlawful means : That the society, organiz~d and associated for the purpose described in the indictment, was an unlawful conspiracy, against the laws of this Commonwealth; and that if the jury believed, from the evidence in the case, that the defendants, or any of them, had engaged in such confederacy, they were bound to find such of them guilty."

A printed copy of the constitution of the Boston Journeymen Bootmakers' Society was given in evidence against the defendants, at the trial; and it was agreed that the same might be referred to by the counsel, in the argument, and by the court, in considering the exceptions.

This case was argued, at the last March term, on all the exceptions alleged at the trial; but the argument on those points only, which were decided by the court, is here inserted.

*Rantoul,* for the defendants. As we have no statute concerning conspiracy, the facts alleged in the indictment constitute an offence, if any, at common law. But the English common law of conspiracy is not in force in this State. We have not adopted the whole mass of the common law of England, indiscriminately, nor of the English statute law which passed either before or after the settlement of our country. So much only of the common law has been adopted, as is applicable to our situation, excluding "the artificial refinements and distinctions incident to the property of a great commercial people; the laws of revenue and police; such especially as are enforced by penalties." 1 Bl. Com. 107, *& seq.* 1 Tucker's Black. Appx. 406. Statutes do not bind colonies, unless they are expressly named. 2 P. W. 75. Chit. on Prerog. 33. The English law, as to acts in restraint of trade, is generally local in its nature, and not suited to our condition. It has never been adopted here, and the colonies are not named in the statutes on that subject which have been passed in England since they were

settled. *Van Ness* v. *Pacard*, 2 Pet. 144. *Wheaton* v. *Peters,* 8 Pet. 658, 659. *Dawson* v. *Shaver*, 1 Blackf. 205. The *Sts.* 1 Edw. VI. *c.* 3 ; 5 Geo. I. *c.* 27 ; 23 Geo. II. *c.* 13 ; 14 Geo. III. *c.* 71 ; the innumerable statutes of laborers, and the statutes against seducing artisans, &c. illustrate this point. All the law we ever had on these subjects was domestic, and is now obsolete. See Plymouth Colony Laws, 28, 72, 76. Anc. Chart. 210. 6 Mass. 73.

The original of the law of conspiracy is in *St.* Edw. I., (A. D. 1304) and includes in its definition only false and malicious indictments. 2 Inst. 561, 562. 2 Reeves Hist. (2d ed.) 239, *& seq.* 1 Hawk. *c.* 72, §§ 1, 2. 6 Petersd. Ab. 96. The early cases were those of such indictments. See Yelv. 116. 9 Co. 55 b. Cro. Eliz. 563, 871, 900.

The next stage of the law of conspiracy appears in the early editions of 1 Hawk. *c.* 72, § 2 : " That all confederacies wrongfully to prejudice a third person are criminal at common law ; as a confederacy by indirect means to impoverish a third person, or falsely and maliciously to charge a man with being the reputed father of a bastard child ; or to maintain one another in any matter, whether it be true or false." By " indirect means," unlawful means are meant.

The case of *The King* v. *Journeymen Tailors*, 8 Mod. 10, was decided after Hawkins's work was published, and is not a part of the law laid down by him, in his first editions. In that case, it was held that a conspiracy among workmen, to refuse to work under certain wages, is an indictable offence. This case, if correctly reported, introduced new law, unless it was decided on the statutes of laborers. (See a compend of these statutes, in Jacob's & Tomlins's Law Dict. Laborers. See also, 1 Bl Com. 426. 14 East, 395.) The doctrine of that case, therefore, is not a part of the law adopted in this State. It was not the doctrine of the common law, when our ancestors came hither, and is not suited to our condition.

But the report of the case in 8 Mod. 10, is not to be depended upon. The book is of no authority, and is entitled to no respect. 1 Bur. 386. 3 Bur. 1326. The doctrine of the

case is not supported by any previous decision. Yet this is the only authority for the repetition of the same doctrine in the numerous books in which it is now found.

Probably the indictment, in that case, was sustained on the statutes of laborers. Though the old precedents of indictments are *contra pacem* only, yet that is because a conspiracy to do acts contrary to those statutes is punishable at common law, in England. *The King* v. *Smith,* 2 Doug. 441. 1 Bolton's Just. 170. 2 ib. 2.

The statutes of laborers were blind struggles of the feudal nobles to avert from themselves the effects of great national ca lamities. Every one of these statutes had a local and temporary cause. In the famine of 1315, and the plague of 1316, par liament vainly strove to alleviate the universal distress, by fixing a legal price for provisions. Yet the scarcity increased, so that the king, going to St. Albans, " had much ado to get victuals to sustain his family." 1 Parl. Hist. 152. And some months later, mothers ate their children. Monk of Malmsb. 166. Walsingham's Chronicles, 107, 108. From the same motives, and with no better success, the plague of 1349 was followed by that remarkable statute *de servientibus,* from which have been derived all subsequent statutes of laborers. *St.* 25 Edw. III. 1 Parl. Hist. 274. 2 Reeves Hist. (2d ed.) 388. This pestilence was as general and destructive as any recorded in history. The deaths in London were mostly of the laboring classes : *Maxime operariorum et servientum.* 5 Rymer's Fœd. 693. King Edward had just been debasing his coin. Daniel in 1 Kennet's Hist. 224. From these causes, the wages of labor rose rapidly, and the law undertook to fix them. But in spite of fines, imprisonment and the pillory, wages and prices continued to rise. Knyghton's Chronicles, 2600.*

---

* Mr. Rantoul examined, in the same manner, the subsequent statutes of laborers — 34 Edw. III. *c.* 10. 12 Rich. II. *c.* 4 7 Hen. IV. *c.* 17. 4 Hen. V. *c.* 4. 2 Hen. VI. *c.* 18. 3 Hen VI. *c.* 1. 23 Hen. VI. *c.* 12. — and especially 1 Edw. VI. *c.* 3. (A. D. 1547.) 2 & 3 Edw. VI. *c.* 15. 3 & 4 Edw. VI. *c.* 16 ; which statutes, continued or modified by 5 Eliz. *c.* 4, (A. D. 1562,) & 1 Jac. 1. *c.* 6, (A. D. 1604) were the law of England at the time of the settlement of Massa

The case in 8 Mod. 10, was about the time of the bursting of the south sea bubble, when laborers sought to withstand the operation of the state of affairs then existing.

It appears from *Rex* v. *Hammond*, 2 Esp. R. 719, that masters may be indicted for showing too great indulgence to their workmen, by raising their wages above the usual rate. Is this the law of Massachusetts ?

In most of the United States, conspiracies, that have been held indictable at common law, are all for acts that are indictable, immoral, or forbidden by statute. *The State* v. *Cawood*, 2 Stew. 360. *The State* v. *Buchanan*, 5 Har. & J. 317. *Respublica* v. *Hevice*, 2 Yeates, 114. *Collins* v. *Common wealth*, 3 S. &. R. 220. *Commonwealth* v. *M‘Kisson*, 8 S. & R. 420. *The State* v. *Murray*, 3 Shepley, 100. *The State* v. *Younger*, 1 Dev. 357. *The State* v. *Tom*, 2 Dev. 569. *The State* v. *De Witt*, 2 Hill's (S. C.) Rep. 282.

In New York and Massachusetts, the cases have gone further ; and in *Commonwealth* v. *Judd*, 2 Mass. 337, Parsons, C. J. says a conspiracy is " the unlawful confederacy to do an unlawful act, or even a lawful act for unlawful purposes." And all the Massachusetts cases come within this definition. *Com monwealth* v. *Ward*, 1 Mass. 473. *Commonwealth* v. *Tibbetts*, 2 Mass. 536. *Commonwealth* v. *Kingsbury*, 5 ́ Mass. 106. *Commonwealth* v. *Warren*, 6 Mass. 74. *Commonwealth* v. *Davis*, 9 Mass. 415. *Commonwealth* v. *Manley*, 12 Pick. 173. So all the New York cases come within the same definition, until since the revised statutes of that State were passed. *Under*

chusetts, and were afterwards continued by 3 Car. I. *c.* 5, & 16 Car. I. *c.* 4, and were unrepealed at the time of the American revolution.

By these statutes, (said Mr. R.) a mere refusal to work was criminal *in an individual ;* and by 2 & 3 Edw. VI. *c.* 15, a *combination* to refuse to work became criminal, for the first time. Such combinations are now legalized by 4 & 5 Wm. IV. *c.* 40.

In 1355, the commons petitioned, " that the points of confederacy may be declared; considering how the judges judge rashly thereof." The king made answer : "None shall be punished for confederacy, but where the statute speaketh expressly upon the point contained in the same statute." 1 Parl. Hist. 289. This petition related to rash judgments on *St.* Edw. I. concerning confeder acies.

*those statutes,* it is held indictable for workmen to conspire to raise their wages by combining to compel journeymen and master workmen to conform to rules established by the persons so combining, for the purpose of regulating the price of labor. This was decided to be a conspiracy " to commit an act injurious to trade or commerce." *People* v. *Fisher,* 14 Wend. 1.

A conspiracy to commit a mere civil injury to an individual is not indictable. *The State* v. *Rickey,* 4 Halst. 293. *The King* v. *Turner,* 13 East, 228. *Rex* v. *Pywell,* 1 Stark. R. 402. Yet nothing more is properly alleged against the present defendants.

A conspiracy to raise wages would not be indictable in England, if it were not unlawful for an individual to attempt to raise his wages. And the indictment, in the case at bar, is bad, because each of the defendants had a right to do that which is charged against them jointly.

All the counts in the present indictment are fatally defective ; *first,* in not averring any unlawful acts or means ; *secondly,* if any such acts or means are averred, in not setting them forth. The vagueness and generality of the charges are such, that *autrefois convict* could not be pleaded to a second indictment for the same acts. When the end is not unlawful, the means should be set forth. *Commonwealth* v. *Warren,* 6 Mass. 74. *Lambert* v. *The People,* 9 Cow. 578. Mere combination is nowhere said to be unlawful, except in 8 Mod. 10.

*Austin,* (Attorney General,) for the Commonwealth. The common law doctrine of conspiracy is part of the law of this Commonwealth. It has been recognized by the legislature, in Rev. Sts. *c.* 82, § 28, and *c.* 86, § 10 ; and was long since enforced by this court. *Commonwealth* v. *Boynton* and *Commonwealth* v. *Pierpont,* 3 Law Reporter, 295.

The charge against the defendants is, in effect, an attempt to monopolize by them certain labor, on their own terms, and to prevent others from obtaining or giving employment. This is an indictable offence. *Rex* v. *Bykerdike,* 1 M. & Rob. 179. 3 Chit. Crim. Law, 1138, *& seq.* Archb. Crim. Pl. (1st ed.) 390. Davis Just. (1st ed.) 335. *The People* v. *Melvin & others,* 2 Wheeler's Crim. Cas. 262.

The case in 8 Mod. 10, (whatever may be the authority of the book,) shows the *fact*, that defendants were convicted of an offence like that with which the present defendants are charged ; and that decision is cited by text writers, and by judges, without any question as to its soundness, or as to the accuracy of the report.

The old statutes of laborers, which have been referred to, do not at all affect the common law doctrine. No reference is made to them in the English books of criminal law, or in the reports of the cases of conspiracy by workmen.

A conspiracy to raise wages is indictable in England, not because it is unlawful for an individual to attempt to raise his wages — as the defendants' counsel suggests — but because a combination for that purpose is criminal and punishable. 6 T. R. 636, per Grose, J. So there are many other cases, in which an act, done by a single person, would not be cognizable by law, but which becomes the subject of indictment, if effected by several with a joint design. 3 Chit. Crim. Law, 1139, 1140. 12 Connect. 112.

Where the means of carrying a conspiracy into effect are alleged, in the indictment, to be unlawful, it is not necessary to set forth those means. If there could be a case, in which the defendants could not well make their defence, without being informed of the means imputed to them, perhaps the court might order a specification to be furnished to them. *Rex* v. *Hamilton*, 7 Car. & P. 448. In the case in 2 Wheeler's Crim. Cas. *ubi sup.* the indictment was like the one at bar. The decision in *Lambert* v. *The People*, 9 Cow. 578, was by a casting vote, reversing the unanimous opinion of the supreme court, and is therefore hardly to be regarded as an authority. 12 Connect. 110, per Bissell, J. See *The King* v. *Eccles*, 3 Doug. 337. *The King* v. *Gill*, 2 Barn. & Ald. 204.

It is not necessary, in order to render a conspiracy indictable, that the means, devised to carry it into effect, should be acts that are indictable. It is sufficient if they are unlawful. In *Commonwealth* v. *Boynton*, already cited, the conspiracy was to cheat by false pretences. Yet false pretences were not then indictable in Massachusetts. 6 Mass. 73

*The People* v. *Fisher*, 14 Wend. 1, is a strong authority in support of the present indictment. It is true that it was under the revised statutes of New York, and proceeded on the ground that the conspiracy was "injurious to trade or commerce." But the question, what is injurious to trade or commerce, is to be determined by the common law.

SHAW, C. J. Considerable time has elapsed since the argument of this case. It has been retained long under advisement, partly because we were desirous of examining, with some attention, the great number of cases cited at the argument, and others which have presented themselves in course, and partly because we considered it a question of great importance to the Commonwealth, and one which had been much examined and considered by the learned judge of the municipal court.

We have no doubt, that by the operation of the constitution of this Commonwealth, the general rules of the common law, making conspiracy an indictable offence, are in force here, and that this is included in the description of laws which had, before the adoption of the constitution, been used and approved in the Province, Colony, or State of Massachusetts Bay, and usually practised in the courts of law. Const. of Mass. *c.* VI. § 6. It was so held in *Commonwealth* v. *Boynton*, and *Commonwealth* v. *Pierpont*, cases decided before reports of cases were regularly published,* and in many cases since. *Commonwealth* v. *Ward*, 1 Mass. 473. *Commonwealth* v. *Judd*, and *Commonwealth* v. *Tibbetts*, 2 Mass. 329, 536. *Commonwealth* v. *Warren*, 6 Mass. 74. Still, it is proper in this connexion to remark, that although the common law in regard to conspiracy in this Commonwealth is in force, yet it will not necessarily follow that every indictment at common law for this offence is a precedent for a similar indictment in this State. The general rule of the common law is, that it is a criminal and indictable offence, for two or more to confederate and combine together, by concerted means, to do that which is unlawful or criminal, to the injury of the public, or portions or classes of the communi

---

* See a statement of these cases, in 3 Law Reporter, 295, 296.

ty, or even to the rights of an individual. This rule of law may be equally in force as a rule of the common law, in England and in this Commonwealth; and yet it must depend upon the local laws of each country to determine, whether the purpose to be accomplished by the combination, or the concerted means of accomplishing it, be unlawful or criminal in the respective countries. All those laws of the parent country, whether rules of the common law, or early English statutes, which were made for the purpose of regulating the wages of laborers, the settlement of paupers, and making it penal for any one to use a trade or handicraft to which he had not served a full apprenticeship — not being adapted to the circumstances of our colonial condition — were not adopted, used or approved, and therefore do not come within the description of the laws adopted and confirmed by the provision of the constitution already cited. This consideration will do something towards reconciling the English and American cases, and may indicate how far the principles of the English cases will apply in this Commonwealth, and show why a conviction in England, in many cases, would not be a precedent for a like conviction here. *The King* v. *Journeymen Tailors of Cambridge*, 8 Mod. 10, for instance, is commonly cited as an authority for an indictment at common law, and a conviction of journeymen mechanics of a conspiracy to raise their wages. It was there held, that the indictment need not conclude *contra formam statuti*, because the gist of the offence was the conspiracy, which was an offence at common law. At the same time it was conceded, that the unlawful object to be accomplished was the raising of wages above the rate fixed by a general act of parliament. It was therefore a conspiracy to violate a general statute law, made for the regulation of a large branch of trade, affecting the comfort and interest of the public; and thus the object to be accomplished by the conspiracy was unlawful, if not criminal.

But the rule of law, that an illegal conspiracy, whatever may be the facts which constitute it, is an offence punishable by the laws of this Commonwealth, is established as well by legislative as by judicial authority. Like many other cases, that of mur-

der, for instance, it leaves the definition or description of the offence to the common law, and provides modes for its prosecution and punishment. The Revised Statutes, *c.* 82, § 28, and *c* 86, § 10, allowed an appeal from the court of common pleas and the municipal court, respectively, in cases of a conviction for conspiracy, and thereby recognized it as one of the class of offences, so difficult of investigation, or so aggravated in their nature and punishment, as to render it fit that the party accused should have the benefit of a trial before the highest court of the Commonwealth. And though this right of appeal is since taken away, by *St. of* 1839, *c.* 161, this does not diminish the force of the evidence tending to show that the offence is known and recognized by the legislature as a high indictable offence.

But the great difficulty is, in framing any definition or description, to be drawn from the decided cases, which shall specifically identify this offence — a description broad enough to include all cases punishable under this description, without including acts which are not punishable. Without attempting to review and reconcile all the cases, we are of opinion, that as a general description, though perhaps not a precise and accurate definition, a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. We use the terms criminal or unlawful, because it is manifest that many acts are unlawful, which are not punishable by indictment or other public prosecution; and yet there is no doubt, we think, that a combination by numbers to do them would be an unlawful conspiracy, and punishable by indictment. Of this character was a conspiracy to cheat by false pretences, without false tokens, when a cheat by false pretences only, by a single person, was not a punishable offence. *Commonwealth* v. *Boynton,* before referred to. So a combination to destroy the reputation of an individual, by verbal calumny which is not indictable. So a conspiracy to induce and persuade a young female, by false representations, to leave the protection of her parent's house, with a view to facilitate her prostitution. *Rex* v. *Lord Grey,* 3 Hargrave's State Trials, 519.

But yet it is clear, that it is not every combination to do un-lawful acts, to the prejudice of another by a concerted action, which is punishable as conspiracy. Such was the case of *The King v. Turner*, 13 East, 228, which was a combination to commit a trespass on the land of another, though alleged to be with force, and by striking terror by carrying offensive weapons in the night. The conclusion to which Mr. Chitty comes, in his elaborate work on Criminal Law, Vol. III. p. 1140, after an enumeration of the leading authorities, is, that " we can rest, therefore, only on the individual cases decided, which depend, in general, on particular circumstances, and which are not to be extended."

The American cases are not much more satisfactory. The leading one is that of *Lambert v. People of New York*, 9 Cow. 578. On the principal point, the court of errors were equally divided, and the case was decided in favor of the plaintiff in error, who had been convicted before the supreme court, by the casting vote of the president. The principal question was, whether an indictment, charging that several persons, intending unlawfully, by indirect means, to cheat and defraud an incor-porated company, and divers others unknown, of their effects, did fraudulently and unlawfully conspire together, injuriously and unjustly, by wrongful and indirect means, to cheat and defraud the company and others of divers effects, and that, in execution thereof, they did, by certain undue, indirect and unlawful means, cheat and defraud the company, &c. was a good and valid in-dictment. As two distinguished senators, and members of the court of errors, took different sides of this question, the subject was fully and elaborately discussed ; the authorities were all reviewed ; and the case may be referred to, as a full and able exposition of the learning on the subject.

Let us, then, first consider how the subject of criminal con-spiracy is treated by elementary writers. The position cited by Chitty from Hawkins, by way of summing up the result of the cases, is this : " In a word, all confederacies wrongfully to prejudice another are misdemeanors at common law, whether the intention is to injure his property, his person, or his charac

ter." And Chitty adds, that "the object of conspiracy is not confined to an immediate wrong to individuals; it may be to injure public trade, to affect public health, to violate public police, to insult public justice, or to do any act in itself illegal." 3 Chit. Crim. Law, 1139.

Several rules upon the subject seem to be well established, to wit, that the unlawful agreement constitutes the gist of the offence, and therefore that it is not necessary to charge the execution of the unlawful agreement. *Commonwealth* v. *Judd*, 2 Mass. 337. And when such execution is charged, it is to be regarded as proof of the intent, or as an aggravation of the criminality of the unlawful combination.

Another rule is a necessary consequence of the former, which is, that the crime is consummate and complete by the fact of unlawful combination, and, therefore, that if the execution of the unlawful purpose is averred, it is by way of aggravation, and proof of it is not necessary to conviction; and therefore the jury may find the conspiracy, and negative the execution, and it will be a good conviction.

And it follows, as another necessary legal consequence, from the same principle, that the indictment must — by averring the unlawful purpose of the conspiracy, or the unlawful means by which it is contemplated and agreed to accomplish a lawful purpose, or a purpose not of itself criminally punishable — set out an offence complete in itself, without the aid of any averment of illegal acts done in pursuance of such an agreement; and that an illegal combination, imperfectly and insufficiently set out in the indictment, will not be aided by averments of acts done in pursuance of it.

From this view of the law respecting conspiracy, we think it an offence which especially demands the application of that wise and humane rule of the common law, that an indictment shall state, with as much certainty as the nature of the case will admit, the facts which constitute the crime intended to be charged. This is required, to enable the defendant to meet the charge and prepare for his defence, and, in case of acquittal or conviction, to show by the record the identity of the charge, so

11 *

that he may not be indicted a second time for the same offence. It is also necessary, in order that a person, charged by the grand jury for one offence, may not substantially be convicted, on his trial, of another. This fundamental rule is confirmed by the Declaration of Rights, which declares that no subject shall be held to answer for any crime or offence, until the same is fully and plainly, substantially and formally described to him.

From these views of the rules of criminal pleading, it appears to us to follow, as a necessary legal conclusion, that when the criminality of a conspiracy consists in an unlawful agreement of two or more persons to compass or promote some criminal or illegal purpose, that purpose must be fully and clearly stated in the indictment; and if the criminality of the offence, which is intended to be charged, consists in the agreement to compass or promote some purpose, not of itself criminal or unlawful, by the use of fraud, force, falsehood, or other criminal or unlawful means, such intended use of fraud, force, falsehood, or other criminal or unlawful means, must be set out in the indictment. Such, we think, is, on the whole, the result of the English authorities, although they are not quite uniform. 1 East P. C. 461. 1 Stark. Crim. Pl. (2d ed.) 156. Opinion of Spencer, Senator, 9 Cow. 586, & seq.

In the case of a conspiracy to induce a person to marry a pauper, in order to change the burden of her support from one parish to another, it was held by Buller, J. that, as the marriage itself was not unlawful, some violence, fraud or falsehood, or some artful or sinister contrivance must be averred, as the means intended to be employed to effect the marriage, in order to make the agreement indictable as a conspiracy. Rex v. Fowler, 2 Russell on Crimes, (1st ed.) 1812. S. C. 1 East P. C. 461.

Perhaps the cases of The King v. Eccles, 3 Doug. 337, and The King v. Gill, 2 Barn. & Ald. 204, cited and relied on as having a contrary tendency, may be reconciled with the current of cases, and the principle on which they are founded, by the fact, that the court did consider that the indictment set forth a criminal, or at least an unlawful purpose, and so rendered it unnecessary to set forth the means; because a confederacy to ac-

complish such purpose, by any means, must be considered an indictable conspiracy, and so the averment of any intended means was not necessary.

With these general views of the law, it becomes necessary to consider the circumstances of the present case, as they appear from the indictment itself, and from the bill of exceptions filed and allowed.

One of the exceptions, though not the first in the order of time, yet by far the most important, was this :

The counsel for the defendants contended, and requested the court to instruct the jury, that the indictment did not set forth any agreement to do a criminal act, or to do any lawful act by any specified criminal means, and that the agreements therein set forth did not constitute a conspiracy indictable by any law of this Commonwealth. But the judge refused so to do, and instructed the jury, that the indictment did, in his opinion, describe a confederacy among the defendants to do an unlawful act, and to effect the same by unlawful means ; that the society, organized and associated for the purposes described in the indictment, was an unlawful conspiracy, against the laws of this Commonwealth ; and that if the jury believed, from the evidence in the case, that the defendants, or any of them, had engaged in such a confederacy, they were bound to find such of them guilty.

We are here carefully to distinguish between the confederacy set forth in the indictment, and the confederacy or association contained in the constitution of the Boston Journeymen Bootmakers' Society, as stated in the little printed book, which was admitted as evidence on the trial. Because, though it was thus admitted as evidence, it would not warrant a conviction for any thing not stated in the indictment. It was proof, as far as it went to support the averments in the indictment. If it contained any criminal matter not set forth in the indictment, it is of no avail. The question then presents itself in the same form as on a motion in arrest of judgment.

The first count set forth, that the defendants, with divers others unknown, on the day and at the place named, being

workmen, and journeymen, in the art and occupation of boot-makers, unlawfully, perniciously and deceitfully designing and intending to continue, keep up, form, and unite themselves, into an unlawful club, society and combination, and make unlawful by-laws, rules and orders among themselves, and thereby govern themselves and other workmen, in the said art, and unlawfully and unjustly to extort great sums of money by means thereof, did unlawfully assemble and meet together, and being so assembled, did unjustly and corruptly conspire, combine, confederate and agree together, that none of them should thereafter, and that none of them would, work for any master or person whatsoever, in the said art, mystery and occupation, who should employ any workman or journeyman, or other person, in the said art, who was not a member of said club, society or combination, after notice given him to discharge such workman, from the employ of such master ; to the great damage and oppression, &c.

Now it is to be considered, that the preamble and introductory matter in the indictment — such as unlawfully and deceitfully designing and intending unjustly to extort great sums, &c.— is mere recital, and not traversable, and therefore cannot aid an imperfect averment of the facts constituting the description of the offence. The same may be said of the concluding matter, which follows the averment, as to the great damage and oppression not only of their said masters, employing them in said art and occupation, but also of divers other workmen in the same art, mystery and occupation, to the evil example, &c. If the facts averred constitute the crime, these are properly stated as the legal inferences to be drawn from them. If they do not constitute the charge of such an offence, they cannot be aided by these alleged consequences.

Stripped then of these introductory recitals and alleged injurious consequences, and of the qualifying epithets attached to the facts, the averment is this ; that the defendants and others formed themselves into a society, and agreed not to work for any person, who should employ any journeyman or other person, not a member of such society, after notice given him to discharge such workman.

The manifest intent of the association is, to induce all those engaged in the same occupation to become members of it. Such a purpose is not unlawful. It would give them a power which might be exerted for useful and honorable purposes, or for dangerous and pernicious ones. If the latter were the real and actual object, and susceptible of proof, it should have been specially charged. Such an association might be used to afford each other assistance in times of poverty, sickness and distress ; or to raise their intellectual, moral and social condition ; or to make improvement in their art ; or for other proper purposes. Or the association might be designed for purposes of oppression and injustice. But in order to charge all those, who become members of an association, with the guilt of a criminal conspir acy, it must be averred and proved that the actual, if not the avowed object of the association, was criminal. An association may be formed, the declared objects of which are innocent and laudable, and yet they may have secret articles, or an agreement communicated only to the members, by which they are banded together for purposes injurious to the peace of society or the rights of its members. Such would undoubtedly be a criminal conspiracy, on proof of the fact, however meritorious and praiseworthy the declared objects might be. The law is not to be hoodwinked by colorable pretences. It looks at truth and reality, through whatever disguise it may assume. But to make such an association, ostensibly innocent, the subject of prosecution as a criminal conspiracy, the secret agreement, which makes it so, is to be averred and proved as the gist of the offence. But when an association is formed for purposes actually innocent, and afterwards its powers are abused, by those who have the control and management of it, to purposes of oppression and injustice, it will be criminal in those who thus misuse it, or give consent thereto, but not in the other members of the association. In this case, no such secret agreement, varying the objects of the association from those avowed, is set forth in this count of the indictment.

Nor can we perceive that the objects of this association, whatever they may have been, were to be attained by criminal

means. The means which they proposed to employ, as averred in this count, and which, as we are now to presume, were es tablished by the proof, were, that they would not work for a person, who, after due notice, should employ a journeyman not a member of their society. Supposing the object of the association to be laudable and lawful, or at least not unlawful, are these means criminal ? The case supposes that these persons are not bound by contract, but free to work for whom they please, or not to work, if they so prefer. In this state of things, we cannot perceive, that it is criminal for men to agree together to exercise their own acknowledged rights, in such a manner as best to subserve their own interests. One way to test this is, to consider the effect of such an agreement, where the object of the association is acknowledged on all hands to be a laudable one. Suppose a class of workmen, impressed with the manifold evils of intemperance, should agree with each other not to work in a shop in which ardent spirit was furnished, or not to work in a shop with any one who used it, or not to work for an employer, who should, after notice, employ a journeyman who habitually used it. The consequences might be the same. A workman, who should still persist in the use of ardent spirit, would find it more difficult to get employment; a master employing such an one might, at times, experience inconvenience in his work, in losing the services of a skilful but intemperate workman. Still it seems to us, that as the object would be lawful, and the means not unlawful, such an agreement could not be pronounced a criminal conspiracy.

From this count in the indictment, we do not understand that the agreement was, that the defendants would refuse to work for an employer, to whom they were bound by contract for a certain time, in violation of that contract; nor that they would insist that an employer should discharge a workman engaged by contract for a certain time, in violation of such contract. It is perfectly consistent with every thing stated in this count, that the effect of the agreement was, that when they were free to act, they would not engage with an employer, or continue in his employment, if such employer, when free to act, should

engage with a workman, or continue a workman in his employ-
ment, not a member of the association. If a large number of
men, engaged for a certain time, should combine together to
violate their contract, and quit their employment together, it
would present a. very different question. Suppose a farmer,
employing a large number of men, engaged for the year, at fair
monthly wages, and suppose that just at the moment that his
crops were ready to harvest, they should all combine to quit his
service, unless he would advance their wages, at a time when
other laborers could not be obtained. It would surely be a con-
spiracy to do an unlawful act, though of such a character, that
if done by an individual, it would lay the foundation of a civil
action only, and not of a criminal prosecution. It would be a
case very different from that stated in this count.

The second count, omitting the recital of unlawful intent and
evil disposition, and omitting the direct averment of an unlawful
club or society, alleges that the defendants, with others unknown,
did assemble, conspire, confederate and agree together, not to
work for any master or person who should employ any workman
not being a member of a certain club, society or combination,
called the Boston Journeymen Bootmaker's Society, or who
should break any of their by-laws, unless such workmen should
pay to said club, such sum as should be agreed upon as a penal-
ty for the breach of such unlawful rules, &c ; and that by
means of said conspiracy they did compel one Isaac B. Wait,
a master cordwainer, to turn out of his employ one Jeremiah
Horne, a journeyman boot-maker, &c. in evil example, &c. So
far as the averment of a conspiracy is concerned, all the re-
marks made in reference to the first count are equally applicable
to this. It is simply an averment of an agreement amongst
themselves not to work for a person, who should employ any
person not a member of a certain association. It sets forth no
illegal or criminal purpose to be accomplished, nor any illegal
or criminal means to be adopted for the accomplishment of any
purpose. It was an agreement, as to the manner in which they
would exercise an acknowledged right to contract with others
for their labor. It does not aver a conspiracy or even an inten-

tion to raise their wages ; and it appears by the bill of excep tions, that the case was not put upon the footing of a conspiracy to raise their wages. Such an agreement, as set forth in this count, would be perfectly justifiable under the recent English statute, by which this subject is regulated. *St.* 6 Geo. IV. *c.* 129. See Roscoe Crim. Ev. (2d Amer. ed.) 368, 369.

As to the latter part of this count, which avers that by means of said conspiracy, the defendants did compel one Wait to turn out of his employ one Jeremiah Horne, we remark, in the first place, that as the acts done in pursuance of a conspiracy, as we have before seen, are stated by way of aggravation, and not as a substantive charge ; if no criminal or unlawful conspiracy is stated, it cannot be aided and made good by mere matter of aggravation. If the principal charge falls, the aggravation falls with it. *State* v. *Rickey,* 4 Halst. 293.

But further ; if this is to be considered as a substantive charge, it would depend altogether upon the force of the word " compel," which may be used in the sense of coercion, or duress, by force or fraud. It would therefore depend upon the context and the connexion with other words, to determine the sense in which it was used in the indictment. If, for instance, the indictment had averred a conspiracy, by the defendants, to compel Wait to turn Horne out of his employment, and to accomplish that object by the use of force or fraud, it would have been a very different case ; especially if it might be fairly construed, as perhaps in that case it might have been, that Wait was under obligation, by contract, for an unexpired term of time, to employ and pay Horne. As before remarked, it would have been a conspiracy to do an unlawful, though not a criminal act, to induce Wait to violate his engagement, to the actual injury of Horne. To mark the difference between the case of a journeyman or a servant and master, mutually bound by contract, and the same parties when free to engage anew, I should have before cited the case of the *Boston Glass Co.* v. *Binney,* 4 Pick. 425. In that case, it was held actionable to entice another person's hired servant to quit his employment, during the time for which he was engaged ; but not actionable to treat

with such hired servant, whilst actually hired and employed by another, to leave his service, and engage in the employment of the person making the proposal, when the term for which he is engaged shall expire.  It acknowledges the established principle, that every free man, whether skilled laborer, mechanic, farmer or domestic servant, may work or not work, or work or refuse to work with any company or individual, at his own option, except so far as he is bound by contract.  But whatever might be the force of the word " compel," unexplained by its connexion, it is disarmed and rendered harmless by the precise statement of the means, by which such compulsion was to be effected.  It was the agreement not to work for him, by which they compelled Wait to decline employing Horne longer.  On both of these grounds, we are of opinion that the statement made in this second count, that the unlawful agreement was carried into execution, makes no essential difference between this and the first count.

.  The third count, reciting a wicked and unlawful intent to impoverish one Jeremiah Horne, and hinder him from following his trade as a boot-maker, charges the defendants, with others unknown, with an unlawful conspiracy, by wrongful and indirect means, to impoverish said Horne and to deprive and hinder him, from his said art and trade and getting his support thereby, and that, in pursuance of said unlawful combination, they did unlawfully and indirectly hinder and prevent, &c. and greatly impoverish him.

If the fact of depriving Jeremiah Horne of the profits of his business, by whatever means it might be done, would be unlawful and criminal, a combination to compass that object would be an unlawful conspiracy, and it would be unnecessary to state the means.  Such seems to have been the view of the court in *The King* v. *Eccles*, 3 Doug. 337, though the case is so briefly reported, that the reasons, on which it rests, are not very obvious.  The case seems to have gone on the ground, that the means were matter of evidence, and not of averment ; and that after verdict, it was to be presumed, that the means contemplated and used were such as to render the combination unlawful and constitute a conspiracy.

Suppose a baker in a small village had the exclusive custom of his neighborhood, and was making large profits by the sale of his bread. Supposing a number of those neighbors, believing the price of his bread too high, should propose to him to reduce his prices, or if he did not, that they would introduce another baker; and on his refusal, such other baker should, under their encouragement, set up a rival establishment, and sell his bread at lower prices; the effect would be to diminish the profit of the former baker, and to the same extent to impoverish him. And it might be said and proved, that the purpose of the associates was to diminish his profits, and thus impoverish him, though the ultimate and laudable object of the combination was to reduce the cost of bread to themselves and their neighbors. The same thing may be said of all competition in every branch of trade and industry; and yet it is through that competition, that the best interests of trade and industry are promoted. It is scarcely necessary to allude to the familiar instances of opposition lines of conveyance, rival hotels, and the thousand other instances, where each strives to gain custom to himself, by ingenious improvements, by increased industry, and by all the means by which he may lessen the price of commodities, and thereby diminish the profits of others.

We think, therefore, that associations may be entered into, the object of which is to adopt measures that may have a tendency to impoverish another, that is, to diminish his gains and profits, and yet so far from being criminal or unlawful, the object may be highly meritorious and public spirited. The legality of such an association will therefore depend upon the means to be used for its accomplishment. If it is to be carried into effect by fair or honorable and lawful means, it is, to say the least, innocent; if by falsehood or force, it may be stamped with the character of conspiracy. It follows as a necessary consequence, that if criminal and indictable, it is so by reason of the criminal means intended to be employed for its accomplishment; and as a further legal consequence, that as the criminality will depend on the means, those means must be stated in the indictment. If the same rule were to prevail in criminal,

which holds in civil proceedings — that a case defectively stated may be aided by a verdict — then a court might presume, after verdict, that the indictment was supported by proof of criminal or unlawful means to effect the object. But it is an established rule in criminal cases, that the indictment must state a complete indictable offence, and cannot be aided by the proof offered at the trial.

The fourth count avers a conspiracy to impoverish Jeremiah Horne, without stating any means ; and the fifth alleges a conspiracy to impoverish employers, by preventing and hindering them from employing persons, not members of the Bootmakers' Society ; and these require no remarks, which have not been already made in reference to the other counts.

One case was cited, which was supposed to be much in point, and which is certainly deserving of great respect. *The People* v. *Fisher*, 14 Wend. 1. But it is obvious, that this decision was founded on the construction of the revised statutes of New York, by which this matter of conspiracy is now regulated. It was a conspiracy by journeymen to raise their wages, and it was decided to be a violation of the statutes, making it criminal to commit any act injurious to trade or commerce. It has, therefore, an indirect application only to the present case.

A caution on this subject, suggested by the commissioners for revising the statutes of New York, is entitled to great consideration. They are alluding to the question, whether the law of conspiracy should be so extended, as to embrace every case where two or more unite in some fraudulent measure to injure an individual, by means not in themselves criminal. " The great difficulty," say they, " in enlarging the definition of this offence, consists in the inevitable result of depriving the courts of equity of the most effectual means of detecting fraud, by compelling a discovery on oath. It is a sound principle of our institutions, that no man shall be compelled to accuse himself of any crime ; which ought not to be violated in any case. Yet such must be the result, or the ordinary jurisdiction of courts of equity must be destroyed, by declaring any private fraud, when committed by two, or any concert to commit it,

criminal." 9 *Cow.* 625. In New Jersey, in a case which was much considered, it was held that an indictment will not lie for a conspiracy to commit a civil injury. *State* v. *Rickey,* 4 Halst. 293. And such seemed to be the opinion of Lord Ellenborough, in *The King* v. *Turner,* 13 East, 231, in which he considered that the case of *The King* v. *Eccles,* 3 Doug. 337, though in form an indictment for a conspiracy to prevent an individual from carrying on his trade, yet in substance was an indictment for a conspiracy in restraint of trade, affecting the public.

It appears by the bill of exceptions, that it was contended on the part of the defendants, that this indictment did not set forth any agreement to do a criminal act, or to do any lawful act by criminal means, and that the agreement therein set forth did not constitute a conspiracy indictable by the law of this State, and that the court was requested so to instruct the jury. This the court declined doing, but instructed the jury that the indictment did describe a confederacy among the defendants to do an un lawful act, and to effect the same by unlawful means — that the society, organized and associated for the purposes described in the indictment, was an unlawful conspiracy against the laws of this State, and that if the jury believed, from the evidence, that the defendants or any of them had engaged in such confederacy, they were bound to find such of them guilty.

In this opinion of the learned judge, this court, for the reasons stated, cannot concur. Whatever illegal purpose can be found in the constitution of the Bootmakers' Society, it not being clearly set forth in the indictment, cannot be relied upon to support this conviction. So if any facts were disclosed at the trial, which, if properly averred, would have given a different character to the indictment, they do not appear in the bill of exceptions, nor could they, after verdict, aid the indictment. But looking solely at the indictment, disregarding the qualifying epithets, recitals and immaterial allegations, and confining ourselves to facts so averred as to be capable of being traversed and put in issue, we cannot perceive that it charges a criminal conspiracy punishable by law. The exceptions must, therefore, be sustained, and the judgment arrested.

Several other exceptions were taken and have been argued ; but this decision on the main question has rendered it unneces sary to consider them.