## STATE v. VAN PELT.

(Filed December 13, 1904).

1. BILLS OF PARTICULARS—*Indictments—Grand Jury.*

> A bill of particulars, not being made by the grand jury, cannot supply a defect in an indictment.

2. BILLS OF PARTICULARS—*Conspiracy.*

> Where a solicitor files a bill of particulars the state is confined in its proof to the items therein set out.

3. INDICTMENTS—*Conspiracy.*

> The bill of particulars in this case makes sufficiently definite the charge and means by which the alleged conspiracy was to be put into execution.

4. CONSPIRACY—*Indictment—Quashal.*

> An indictment charging that certain persons notified the prosecutor that he would not be considered in sympathy with organized labor if he employed others than union men, nor if he retained non-union men with whom he had already contracted a year in advance; and upon refusal of prosecutor to discharge the non-union men and not to agree to employ only union men, a notice was made in a newspaper that at a meeting of carpenters and joiners the attitude of the prosecutor was declared unfair toward organized labor and so listed, and that no union carpenter would work any material from the shop of the prosecutor after a given date, does not constitute a conspiracy.

STATE *v.* VAN PELT.

INDICTMENT against A. Van Pelt, W. T. R. Jenkins, C. A. Sherman, S. W. Henry and S. A. Sherman, heard by *Judge M. H. Justice* at May Term, 1904, of the Superior Court of ROWAN County.

This was an indictment against the defendants in the following words, to-wit: "The jurors for the State, upon their oath, present that A. Van Pelt, W. T. R. Jenkins, C. A. Shuman, S. W. Henry and S. A. Shuman, being persons of evil minds and dispositions, together with divers other evil-disposed persons, whose names are to the jurors unknown, wickedly devising and intending to injure and destroy one C. A. Rice of the county of Rowan and State of North Carolina, in his trade and business as a dealer in lumber, on the 15th day of January, 1904, at and in the county of Rowan and State aforesaid, and within the jurisdiction of this Court, fraudulently, wickedly, maliciously and unlawfully did conspire, combine, confederate and agree together, between and amongst themselves unlawfully to injure and destroy the said C. A. Rice in his trade and business which he then and there used, exercised and carried on as aforesaid, against the peace and dignity of the State. And the jurors aforesaid, upon their oaths aforesaid, do further present that the said A. Van Pelt, W. T. R. Jenkins, C. A. Shuman, S. W. Henry and S. A. Shuman, together with other evil-disposed persons whose names are to the jurors unknown, contriving and devising to injure and destroy the said C. A. Rice in his trade and business aforesaid, and as much as in them lay unlawfully and feloniously to ruin him in his trade and business as a dealer in lumber which he then and there carried on, used and exercised as aforesaid, and to prevent and hinder him from using, exercising and carrying on the said trade and business in as full, ample and beneficial a manner as he was used and accustomed to, on the 15th day of January, 1904, in the county and State aforesaid, and within the jurisdiction

of this Court, unlawfully, wickedly and maliciously did con-
spire, confederate, combine and agree together, with divers
fraudulent and wicked means and devices, to injure, oppress
and impoverish the said C. A. Rice, and wholly to prevent
and hinder him from using, exercising and carrying on his
trade and business of a dealer in lumber as aforesaid, and
caused to be published in a certain newspaper issued daily
in the city of Salisbury, county and State aforesaid, a certain
article in words and figures as follows, to-wit:

" 'ACTION OF THE CARPENTERS AND JOINERS.—At a meet-
ing of the Carpenters and Joiners held last evening, for his
attitude towards organized labor Mr. C. A. Rice was declared
unfair, and so listed, and that no union carpenter would work
any material from his shop after February 15, 1904.

" 'S. A. SHUMAN, SR., *President.*
" 'W. T. R. JENKINS, R. S.'

"And that the aforesaid publication was caused to be
printed as aforesaid in the newspaper aforesaid on the 16th
day of January, 1904, to the great damage of the said C. A.
Rice, to the evil and pernicious example of all others in the
like case offending, and against the peace and dignity of the
State."

Defendants moved that the State be required to file a bill
of particulars to the first count in the indictment. Motion
allowed, whereupon the Solicitor filed the following bill of
particulars, to-wit:

"The State alleges that the defendants, A. Van Pelt, S. A.
Shuman, W. T. R. Jenkins, S. W. Henry and C. A. Shuman,
together with other evil-disposed persons to the State un-
known, contriving and devising with the intent to injure and
destroy one C. A. Rice in his trade and business as a dealer
in and manufacturer of lumber, and as much as in them lay

unlawfully and maliciously to injure and ruin him in said trade and business as a dealer in and manufacturer of lumber which he then and there carried on, used and exercised in the county of Rowan and State of North Carolina, and to prevent and hinder him from using, exercising and carrying on the said trade and business and manufacture in as full, ample and beneficial a manner as he was used and accustomed to, on the 15th day of January, 1904, in the county and State aforesaid, and within the jurisdiction of this Court, unlawfully, wickedly and maliciously did conspire, combine and agree together to injure, oppress and impoverish the said C. A. Rice, and with the intent to prevent and hinder him from using and carrying on his trade and business as a dealer in and manufacturer of lumber as aforesaid, caused to be published in a certain newspaper in the city of Salisbury, county and State aforesaid, a certain article in words and figures as follows, to-wit:

" 'ACTION OF CARPENTERS AND JOINERS.—At a meeting of the Carpenters and Joiners held last evening, for his attitude towards organized labor Mr. C. A. Rice was declared unfair, and so listed, and that no union carpenter would work any material from his shop after February 15, 1904.

" 'S. A. SHUMAN, SR., *President.*

" 'W. T. R. JENKINS, R. S.'

"And that the aforesaid publication was caused by the defendants to be printed in the newspaper as aforesaid on the 16th day of January, 1904, to the great damage of the said C. A. Rice, and that it was the intent and purpose of the defendants, by said publication, to injure, oppress and impoverish the said C. A. Rice in his trade and business and manufacture as aforesaid, and that the defendants did combine, agree and conspire together to publish said notice as above set

forth for the unlawful and malicious purpose of injuring the said C. A. Rice in his trade and business and manufacture as aforesaid, by inducing all persons who would otherwise have purchased lumber and material from the said C. A. Rice to refrain from so doing, for fear of the ill-will of the defendants and other evil-disposed persons so conspiring and contriving with them, whose names are to the State unknown, and for fear that if they—that is to say, all persons who would otherwise have purchased lumber and material from the said C. A. Rice—should so purchase the same, they, the said persons, would be subject to delay and inconvenience by reason of the refusal of the defendants, and other evil-disposed persons whose names are unknown to the State, to work the material so purchased from the said C. A. Rice, and that in so conspiring and combining together to injure the business of the said C. A. Rice as aforesaid, by the publication as aforesaid, in manner and form as above set forth, the defendants intended to prevent persons desiring to purchase lumber from purchasing the same from the said C. A. Rice, and to influence and deter persons desiring lumber from procuring the same from the said C. A. Rice, with the intent to injure, destroy and damage the trade and business and manufacture of the said C. A. Rice.

"And before the said 15th day of January, 1904, as hereinbefore mentioned, the said A. Van Pelt, W. T. R. Jenkins and S. W. Henry, three of the defendants in this case, did unlawfully, wickedly, maliciously conspire and agree together, and did go together, on or about the 13th day of January, 1904, to the place of business of the said C. A. Rice in the city of Salisbury, in the county and State aforesaid, and then and there notified the said C. A. Rice that he, the said C. A. Rice, could not be considered in sympathy with organized labor unless he kept constantly employed only union men, and notified him further that he would not be in sym-

pathy with organized labor if he kept in his employ any non-union men, notwithstanding the fact that he had heretofore employed and contracted with non-union men for as much as a year in advance, and to discharge them would be a violation of his contract with such non-union men; and upon being informed by said Rice that he would not discharge any non-union men with whom he had contracted in advance by the year to work for him, and that he would not agree to employ only union men in his business, the said A. Van Pelt, W. T. R. Jenkins and S. W. Henry went away, and on the 15th day of January, 1904, in furtherance of their said conspiracy and combination to injure and destroy the business of the said C. A. Rice as aforesaid, they combined and agreed among themselves and with the other defendants, and with divers evil-disposed persons whose names are to the State unknown, to publish the aforesaid notice hereinbefore set forth, for the purpose aforesaid, and did actually cause the same to be published with the intention to injure and destroy the business and trade and manufacture of the said C. A. Rice as above set forth.     HAMMER, *Sol.*"

The counsel for the defendants thereupon demurred *ore tenus* to the bill of indictment, and moved to quash, for that the bill, together with the bill of particulars, did not charge a criminal offense. Motion and demurrer sustained, and bill quashed. The State excepted to the order of the Court and appealed to the Supreme Court.

*Robert D. Gilmer, Attorney-General, J. H. Horah* and *A. H. Price,* for the State.

*T. F. Klutlz, R. Lee Wright* and *Overman & Gregory,* for the defendants.

CONNOR, J. We do not find it necessary to consider the sufficiency of the first count in the bill. By filing the bill of

particulars the State, for the purpose of this appeal, makes sufficiently definite the charge and means by which the alleged conspiracy was to be put into execution. The demurrer *ore tenus* is based upon the indictment and the bill of particulars. We, however, fully approve the language of *Shaw, C. J.,* in *Com. v. Hunt,* 45 Mass., 111. "From this view of the law respecting conspiracy we think it an offense which especially demands the application of that wise and humane rule of the common law that an indictment shall state with as much certainty as the nature of the case will admit the facts which constitute the crime intended to be charged. This is required to enable the defendant to meet the charge and prepare for his defense, and, in case of an acquittal or conviction, to show by the record the identity of the charge, so that he may not be indicted a second time for the same offense." It is further said that when the criminality of the offense consists in an unlawful agreement to compass some criminal or illegal purpose, that purpose must be fully and clearly stated in the indictment; if the criminality intended to be charged consists in the agreement to compass some purpose not unlawful or criminal in itself by the use of force, fraud, falsehood or other criminal or unlawful means, such intended means must be set forth in the indictment. *Lambert v. People,* 9 Cow., 578. In *State v. Trammell,* 24 N. C., 379, *Gaston, J.,* says: "It is said that the gist of a criminal conspiracy is the unlawful concurrence of many in a wicked scheme and that the crime of conspiracy is complete without any act having been done to carry it into execution. This consideration renders it but the more important that the charge of conspiracy should clearly set forth the purpose and object of the combination, as in these are to be found almost the only marks of certainty by which the parties accused may know what is the accusation they are to defend."

*Waite, C. J.,* in *U. S. v. Cruikshank,* 92 U. S., 542, pass-

ing upon the sufficiency of an indictment for conspiracy,
says: "The accused has therefore the right to have a specifi-
cation of the charge against him in this respect, in order that
he may decide whether he should present his defense by mo-
tion to quash, demurrer or plea; and the Court, that it may
determine whether the facts will sustain the indictment.
So here the crime is made to consist in the unlawful combina-
tion with an intent to prevent the enjoyment of any right
granted or secured by the Constitution, etc. All rights are
not so granted or secured. Whether one is so or not is a
question of law to be decided by the Court, not the prosecu-
tor. Therefore the indictment should state the particulars
to inform the Court as well as the accused. It must be made
to appear—that is to say to appear from the indictment
without going further—that the acts charged will if proved
support a conviction for the offense alleged." *Mr. Justice
Clifford,* concurring in the result, says: "Descriptive allega-
tions in criminal pleadings are required to be reasonably defi-
nite and certain, as a necessary safeguard to the accused
against surprise, misconception and error in conducting his
defense and in order that the judgment in the case may be
a bar to a second accusation for the same charge. Consid-
erations of this kind are entitled to respect, but it is obvious
that if such description of the ingredient of the offense cre-
ated and defined by an act of Congress is held to be suffi-
cient, the indictment must become a *snare* to the accused."
*Pettibone v. United States,* 148 U. S., 197. In *State v.
Younger,* 12 N. C., 367, 17 Am. St., 571, the offense is fully
described and the means by which it was consummated set
out, to-wit, by making the prosecutor drunk and falsely,
fraudulently and deceitfully cheating him at a game of cards.

While it is the right of the defendant to demand and the
duty of the Court to require a bill of particulars, this is for
the benefit of the defendant and does not in any degree de-

prive him of the right to have the bill of indictment quashed if insufficient. *Mr. Bishop* well says: "The bill of particulars not being made by the grand jury on oath cannot supply any defect in the indictment." Crim. Prac., sec. 646. It would seem that as the defendant is entitled to demand the bill of particulars, and as the State on the trial is restricted to proofs of the facts set out, it would be more in accordance with reason, good criminal pleading and the safety of the citizen to require the State to set out *in the indictment* the charge in full, together with the means by which the alleged conspiracy is to be effectuated. It is so held by many courts and required by statutes. No offense is so easily charged and so difficult to be met unless the defendants are fully informed of the facts upon which the State will rely to sustain the indictment. While technical objections to indictments are not to be sustained, substantive and substantial facts should be alleged. General and undefined charges of crime, especially those involving mental conditions and attitudes, should not be encouraged. They are not in harmony with the genius of a free people, living under a written Constitution. We can see no good reason why an exception to the general rules of criminal pleading should be made in favor of this crime; certainly there is nothing in the history of the criminal law of England or this country to recommend it to the favor of courts having regard for liberty regulated by law. Such an indictment has been appropriately termed "a drag-net of vague charges" to catch innocent persons, who in times of excitement may be convicted by the suspicions and prejudices of juries. An examination of the cases cited in Wright on Criminal Conspiracy, 186, discovers a state of painful uncertainty in the rulings of courts, explained frequently by the political or other bias of temper or opinions of the Judge. Certainty should never be sacrificed to the plea for simplicity. Viewed properly

136——41

there is no conflict between them. We cannot but think that an omission of the needless repetition of epithets and denunciatory terms of the defendant and the insertion, in place thereof, in plain language, of the facts relied upon would be conducive to that certainty and simplicity which are the real safeguards to society and the citizen. General and indefinite descriptions of alleged crimes, like general warrants, "are dangerous to liberty and ought not to be tolerated." Const., Art. I, sec. 15. "Every man has a right to be informed of the accusation against him." *Ib.*, 11. These truths are of the essence of civil liberty. They are not to be explained away to meet the demand for speedy trials and swift punishment. "No man shall be put to answer any criminal charge    *    *    *    but by an indictment," etc. We find nothing here of "bills of particulars" drawn up, after indictment found, by prosecuting officers to aid defective bills, or bills in which, if the charge was set forth in a full and specific manner, could never have received the endorsement of a grand jury. "Bills of particulars" are suggestive of "Informations" which became odious because of the oppressive use made of them by officers of the Crown in the prosecution of persons charged with offense. When grand juries would not aid in such prosecutions "Informations" were resorted to. They recall the days of "constructive treasons." Men were hung, drawn and quartered for *"imagining"* the death of the King. They recall the time when Titus Oates swore away the lives of innocent men charged with being members of an imaginary "Popish Plot."

The Solicitor having filed a bill of particulars, the State is confined "to the items therein set down." Bish. Crim. Proc., 643. We are thus brought to a consideration of the question whether eliminating all irrelevant matter, the facts charged and admitted by the demurrer constitute a criminal conspiracy—either by reason of the character of that which

was agreed to be done or the means by which the agreement
was to be effectuated. "The preamble and introductory mat-
ter in the indictment—such as unlawfully, deceitfully, de-
signing and intending unjustly to extort great sums, etc.—is
mere recital and not traversable, and therefore cannot aid
an imperfect averment of facts constituting the description
of the offense. The same may be said of the concluding mat-
ter which follows the averment as to the great damage, etc."
Stripped of these introductory recitals and alleged injurious
consequences and the qualifying epithets attached to the
facts, the averment is this, that the defendants conspired to
injure the prosecutor in his trade and business and thereby
impoverish him: (1) That pursuant to this agreement three
of the defendants on January 13, 1904, went together to the
place of business of the prosecutor and notified him that he
could not be considered in sympathy with organized labor
unless he kept constantly employed union men. (2) That he
would not be considered in sympathy with organized labor
if he kept in his employment non-union men—notwithstand-
ing the fact that he had theretofore employed and contracted
with non-union men for as much as a year in advance.
(3) That upon being informed by said Rice that he would
not discharge non-union men with whom he had contracted
and would not agree to employ only union men, etc., the
defendants published the notice set out in the bill of particu-
lars. That the purpose of publishing said notice was to
induce all persons who would otherwise have purchased lum-
ber and material from the said Rice to refrain from doing
so (a) for fear of the ill-will of the defendants, etc., and
other evil-disposed persons; (b) that they would be subject
to delay and inconvenience by reason of the refusal of the
defendants and other evil-disposed persons, whose names are
to the State unknown, to work the material so purchased
from the said C. A. Rice, etc. That by the means aforesaid

STATE v. VAN PELT.

the defendants intended to prevent persons desiring to purchase lumber from purchasing the same from the said C. A. Rice, etc. That by the means aforesaid the defendants intended to prevent persons desiring to purchase lumber from purchasing the same from the said C. A. Rice, and to influence and deter persons desiring lumber from purchasing the same from the said C. A. Rice with the intent to injure and destroy, etc. We omit at this time, any reference to the alleged motive of the defendants.

A criminal conspiracy is defined to be an. agreement of two or more persons to do an unlawful act or to do a lawful act by unlawful means. *Shaw, C. J.,* in *Com. v. Hunt,* says: "Without attempting to review or reconcile all the cases, we are of the opinion that as a general description, though perhaps not a precise or accurate definition, a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means. We use the terms criminal or unlawful, because it is manifest that many acts are unlawful which are not punishable by indictment or other public prosecution, and yet there is no doubt, we think, that a combination by numbers to do them would be an unlawful conspiracy and punishable by indictment. * * * But yet it is clear that it is not every combination to do unlawful acts to the prejudice of another which is punishable as a conspiracy."

Mr. Wright in his work on Criminal Conspiracy classifies the decisions in the different States and places North Carolina in the class which holds that conspiracies are indictable "where neither the object or the means are criminal but where injury results to individuals," and for this he cites *State v. Younger,* 12 N. C., 357. With the exception of *State v. Younger,* we find no case in our own Reports in

which an indictment is sustained which did not allege a conspiracy to commit acts, or the bill of particulars did not set out facts showing a conspiracy to commit acts, indictable either at common law or under some statute. It must be conceded that expressions are to be found in the opinions of the Court to the contrary. In *State v. Tom,* 13 N. C., 569, the charge was a conspiracy by slaves to commit murder. It was made indictable by statute. It was equally so at common law. In *State v. Trammell,* 24 N. C., 379, *Judge Gaston* says that it is not necessary to decide whether the facts set out constitute a criminal conspiracy. The Court held that in no view were the defendants guilty. In *State v. Christianbury,* 44 N. C., 46, the Court expressly declined to pass upon the sufficiency of the bill, putting the case off on the statute of limitations. In *State v. Brady,* 107 N. C., 822, the second count charged a conspiracy to cheat and defraud by falsely and fraudulently representing that certain lands contained gold mines, whereas the defendant well knew that the said lands did not contain gold mines, etc. There was a motion to quash which was denied. There was a general verdict of guilty. The Court said that if either count was good it would support the verdict. This was sufficient to dispose of the appeal. The second count was undoubtedly good and the motion to quash could not be allowed. In *State v. Powell,* 121 N. C., 635, *Montgomery, J.,* says that the bill charged a conspiracy to commit an offense indictable at common law. In *State v. Wilson,* 121 N. C., 650, the question is not raised or discussed—a new trial was given on other grounds. In *State v. Earwood,* 75 N. C., 210, the only question decided was the admissibility of evidence upon which a new trial was given. In *State v. Howard,* 129 N. C., 585, there were three counts. The first charged generally a conspiracy to cheat and defraud. The second and third, setting out the facts showing a conspiracy to rob and to ob-

tain money under false pretenses, and the means resorted to, were *nol prossed* but referred to as a bill of particulars. The first count was sustained by a divided Court, the present *Chief Justice,* writing for the majority, saying that by the second and third counts considered as a bill of particulars, the defendants were fully informed, etc. It will thus be seen that in all of the cases in our Reports a conspiracy to commit an indictable offense is charged in the indictment, or facts set forth in a bill of particulars, charging a conspiracy to commit such an offense. In Younger's case, *supra,* the charge in the indictment was that the defendants conspired to cheat and defraud the prosecutor, etc., and to accomplish that end they procured him to be intoxicated and engaged him to play at cards, by means whereof by falsely, fraudulently and deceitfully playing at the game of cards they cheated him, etc. It is not necessary to discuss the question whether the acts charged were indictable at common law. *State v. Phipher,* 65 N. C., 321. We incline to the opinion that they were. The learned *Chief Justice* writing the opinion did not seem to think so, although he says: "Playing at cards for money was in itself unlawful." The word is of such varied and uncertain import that it is unfortunate that it was ever used to define a criminal act. It is not our purpose to bring the *decision* of Younger's case into question, but we cannot accept the definition given of a criminal conspiracy. "Every combination to injure individuals or to do acts which are unlawful or prejudicial to the community is indictable." It will be noted that this case was submitted by the Attorney-General without argument and the defendants were not represented by counsel. The Court cites but one case to sustain the definition. *King v. Journeyman Tailors of Cambridge,* 8 Mad., 10 (1721). That was an indictment against certain journeymen tailors for a conspiracy to raise their wages. The Court said: "A conspiracy of

any kind is illegal, although the matter about which they conspired might have been lawful for them to do if they had not conspired to do it, as appears in the case of *Tubwomen v. The Brewers.*" An examination of the report of that case shows the length to which counsel and Court went in sparring over technicalities and losing sight of the real merits of the question. Quite a number of objections were made to the indictment which at this day would not be listened to with any degree of respect. The Court announces the proposition that any conspiracy, however lawful its purpose, is indictable. The case has been treated with but scant courtesy in England and would not at this day be cited as authority. By statute it was made indictable for journeymen tailors to enter into any contract or agreement to advance their wages. Happily this and all other such laws have been repealed in England and were never in force in this State. *Lord Campbell* in *Hilton v. Eckerby,* 6 E. & B. (88 E. C. L., 62), 1855, repudiated the definition given in the Tailors' case, referring to what it said in this and other cases as "loose expressions." He says: "I cannot bring myself to believe, without authority more cogent, that if two workmen who sincerely believe their wages to be inadequate should meet and agree that they would not work unless their wages were raised, without designing or contemplating violence or any illegal means for gaining their object, they would be guilty of a misdemeanor and liable to be punished by fine and imprisonment. The object is not illegal; and, therefore, if no illegal means are used, there is no indictable conspiracy." The courts have found but little difficulty in adhering to satisfactory and consistent rulings in those cases wherein the conspiracy charged is to commit acts which are criminal and indictable either at common law or by statute. *Dr. Wharton* says: "The conflict begins when we reach those combinations which are assumed to be indictable, not as

aimed at an indictable offense, but from the idea that the
policy of the law forbids the reaching of the attempted ob-
ject by a conspiracy." Crim. Law, 357. After discussing
conspiracies to cheat and defraud, he says: "But to extend
indictable conspiracies so as to include cases where acts, not
in themselves indictable, are attempted by concert involving
neither false statement nor concerted force should be reso-
lutely opposed. A distressing uncertainty will oppress the
law if the mere act of concert in doing an indifferent act be
held to make such act criminal. We all know what acts are
indictable, and if we do not, the knowledge is readily ob-
tainable. Such offenses when not defined by statute, are
limited by definitions which long processes of judicial inter-
pretation have hardened into shapes which are distinct, solid,
notorious and permanent. It is otherwise, however, when
we come to speak of acts which though not penal when they
are committed by persons acting singly, are supposed to be-
come so when brought about by concert which involves
neither fraud nor force. * * * No man may know in
advance whether any enterprise in which he may engage may
not in this way become subject to prosecution. It is essen-
tial to the constitution of an indictable offense * * *
that it should be prohibited either by statute or common law,
but conspiracies to commit by non-indictable means non-
indictable offenses, if we resolve them into their elements,
are neither prohibited by common law nor by statute. * * *
An act of business enterprise in purchasing goods in a cheap
market for the purpose of selling them in a dear market,
which in one phase of judicial sentiment would be regarded
as a meritorious impetus to commercial activity, would be in
another phase of judicial sentiment, as it once has been
treated, an indictable offense. Legislative and judicial com-
promises which one court may view as essential to the work-
ing of the political machine, another court may hold to be

indictable as a corrupt conspiracy." In this country, in which judges are in respect to their source of appointment and tenure sensitive to changes of popular opinion and temper, amid the ever-increasing acuteness of the struggle between opposing social and industrial forces, the lines which separate a criminal from a non-criminal conspiracy should be clearly defined. To a timid, conservative, judicial mind trained to regard even the slightest disturbance of such forces as portending danger to the peace of the State, a combination of the most harmless character would assume "unlawful" form and force. To a different type of judicial mind, believing that the safety and highest interest of the State are promoted by the freest possible play of mind and action, in trade competition, "however severe and egotistical, if unattended by circumstances of dishonesty, intimidation, molestation or other such illegalities," the same combination would appear not only lawful, but stimulating to trade in the community. The study of the struggle between the ruling class and the laborers in England, culminating in the passage of the statute of 38 and 39 Vict., is of interest to the student and value to the law-maker and judge. It is declared by that statute that an agreement or combination to do any act in furtherance of a trade dispute shall not render the person committing it indictable for a conspiracy if such acts committed by one person would not be punishable as a crime. "These latter words may almost be described as 'The Workman's Charter of Liberty,' for they dispose at once and forever of the contention that a combination to do acts, not illegal in themselves, is entitled to be regarded by the law as a conspiracy." Cent. Law Reform, 253. A great English statesman said that for the first time employers and employed sat under equal laws. As indicating the practical operation of the definition of a criminal conspiracy contended for by the State we may recall some incidents coming under our observation.

Not long since, the farmers producing cotton in this and
other States believed that their interests demanded combined
action to protect themselves against what they considered an
unreasonably high price charged by the manufacturers for
jute cotton bagging. They openly and with the avowed pur-
pose of compelling the manufacturer to sell bagging at a
lower price and of course reduce their profits and to that
extent injure them in their trade and business, formed com-
binations and adopted measures, entirely peaceful and law-
ful, to accomplish their purpose. They agreed themselves,
urged and by various means induced others to refrain from
buying or using jute bagging. They encouraged the use of
other kinds of bagging, and by and through organization
maintained a peaceful but effective contest with the manu-
facturers. Their declared purpose was to injure, cripple and,
if necessary, destroy the manufacturer unless they sold their
product at a lower price. Again, at a more recent date, the
producers of tobacco found the price of their product, as they
thought, unreasonably low. They believed that a large and
wealthy corporation, being the largest purchaser in the mar-
kets, was responsible for the low price of tobacco. Large
numbers of the producers, with the avowed purpose of com-
pelling the purchasers, and especially the said corporation, to
pay them higher prices, combined and agreed that they would
withhold their product from the market, urged and induced
all other producers to do so. They declared their purpose to
refuse to buy the goods of the corporation, and urged and
induced merchants to refuse to buy or sell such goods. They
held public meetings, made and issued addresses, and by
many other lawful and peaceful means sought to injure and,
so far as possible, destroy the offending corporation. It did
not occur to any one that these men were guilty of a criminal
conspiracy, nor were they. It must be noted that in neither
instance was there any legal standard as to the price of cotton

bagging or tobacco; they were sold in open market and, from a legal standpoint, with fair competition. The farmers who in one case were buyers thought bagging unreasonably high, and in the other, being sellers, thought tobacco unreasonably low. They believed that in order to protect themselves from what they regarded unfair treatment they must organize. That their purpose was to injure the manufacturer in the one instance and the purchaser in the other in their trade and business was not denied, but openly avowed; their defense being that they were seeking fair treatment at the hands of both. We must keep in mind the fact that we are discussing the question as it is affected by the common law. The proposition is that the defendants conspired for the purpose of injuring the prosecutor in his trade and business, and that it is unlawful for them to do so. It cannot be that every conspiracy to injure one in his trade and business, without reference to the means to be employed, is criminal. A carpenter, or joiner, has by his apprenticeship, study and experience acquired skill and knowledge in his trade. His capital consists in his physical strength and his intellect trained and directed by his skill and experience. It is the use of this which in a sense he offers for sale. In what respect, for the purpose of securing the best prices for his labor on the best terms, do his rights differ from the man who has cotton for sale, the product of his capital—land and labor—or the man who has money to invest in mercantile or manufacturing enterprise? Each of them enter into the field of competition. Each finds that organization with others engaged in the same field of labor or investment will secure better results and fairer treatment from those with whom he deals. There is no evil or harm in organization *per se.* Every copartnership, corporation, joint stock company and other association of labor or capital is a recognition of this truth. We find no better illustration of the correct principle upon which this

right depends and the benefits which may come from its application under proper limitations than that given by *Chief Justice Shaw* in *Com. v. Hunt, supra.* "Suppose a baker in a small village had the exclusive custom of his neighborhood and was making large profits by the sale of his bread. Supposing a number of those neighbors, believing the price of bread too high, should propose to him to reduce his prices, or if he did not they would introduce another baker, and on his refusal such other baker should, under their encouragement, set up a rival establishment and sell his bread at lower prices; the effect would be to diminish the profit of the former baker and to the same extent to impoverish him. And it might be said, and proved, that the purpose of the association was to diminish his profits and thus impoverish him, though the ultimate and laudable object of the combination was to reduce the price of bread to themselves and their neighbors. * * * We think, therefore, that associations may be entered into, the object of which is to adopt measures that may have a tendency to impoverish another—that is, to diminish his gains and profits—and yet so far from being criminal or unlawful the object may be highly meritorious and public-spirited. The legality of such an association will therefore depend upon the means to be used for its accomplishment. If it is to be carried into effect by fair or honorable and lawful means, it is, to say the least, innocent. If by falsehood or force it may be stamped with the character of conspiracy. It follows as a necessary consequence that if criminal and indictable, it is so by reason of the criminal means intended to be employed for its accomplishment." Although decisions have been made by some of the American courts which hold otherwise, they are in every instance based upon the principle of the journeymen tailors' or other English cases which follow that decision. *Mr. Wright,* after a review of the cases, says: "These authorities, on the whole, strongly favor the

STATE *v.* VAN PELT.

view that a combination to injure a private person (otherwise than by fraud) is not as a general rule criminal, unless some criminal means are to be used." Cases may be found to the contrary. *Judge Holmes,* in his dissenting opinion in *Vegelahn v. Gunter,* 167 Mass., 92, discusses the question with much force and clearness. Speaking of the right of laborers or mechanics to combine to promote their interests, he says: "If it be true that workingmen may combine with a view to getting the greatest possible returns, it must be true that when combined they have the same liberty that combined capital has to support their interest, by argument, persuasion and the bestowal or refusal of those advantages which they otherwise lawfully control. * * * The fact that the immediate object of the act by which the benefit to themselves is to be gained is to injure their antagonist does not necessarily make it unlawful any more than when a great house lowers the price of certain goods for the purpose and with the effect of driving a smaller antagonist from the business. Indeed, the question seems to me to have been decided as long ago as 1842 by the good sense of *Chief Justice Shaw* in *Com. v. Hunt.*" He further says: "There is a notion, which latterly has been insisted on a good deal, that a combination of persons to do what any one of them might lawfully do by himself will make the otherwise lawful conduct unlawful. It would be rash to say that some, as yet, unformulated truth may not be hidden under this proposition. But in the general form in which it has been presented and accepted by many courts, I think it plainly untrue, both on authority and on principle." See, also, his dissenting opinion in *Plant v. Woods,* 176 Mass., 504.

*Judge Caldwell,* in *Ames v. Railroad,* 62 Fed., 714, says: "Organized labor is organized capital. It is capital consisting of brains and muscle. * * * If it is lawful for the stockholders and officers of a corporation to associate and

confer together for the purpose of reducing the wages of its employees, or for devising other means for making their investment more profitable, it is equally lawful for organized labor to associate, consult and confer with a view to maintain or increase wages." *Thomas v. Railroad,* 62 Fed., 803; *People v. Radt,* 71 N. Y. Supp., 846. It is said: "One may refuse to deal with a firm because of a belief that it does not give honest compensation for labor, and may ask his friends or the public to do the same thing, and the conduct may do injury to the public without thereby becoming illegal." *Ib.* "An agreement among the members of an association of plumbers not to deal with wholesale dealers who sell to any who are not members of the association, and the sending notices to that end, do not constitute an unlawful conspiracy, since the object of the combination and the means adopted for its accomplishment are lawful. *Macauley v. Tierney,* 19 R. I., 255, 37 L. R. A., 455. In *Mfg. Co. v. Hollis,* 54 Minn., 223, it appears that the plaintiff was a manufacturer and dealer, wholesale and retail, in lumber and other building material. The defendant was a voluntary association of retail lumber dealers. It had certain rules for its government and that of its members. The plaintiff sold two bills of lumber to contractors, or consumers, in places where members of the association were engaged in the retail business. The secretary of the association made a demand upon the plaintiff for ten per cent. on the sales so made. The demand not being complied with, the secretary notified, or, as the complaint averred, threatened that unless plaintiff immediately settled the matter he would send to all members of the association the lists or notices provided by the by-laws, notifying them that plaintiff refused to comply with the rules and was no longer in sympathy with it. The Court, referring to the affidavits, etc., said: "Both the affidavits and brief in behalf of the plaintiff indulge in a great deal of strong and

STATE *v.* VAN PELT.

even exasperated assertion, and in many words and expressions of very indefinite and illusive meaning, such as 'wreck,' 'coerce,' 'conspiracy,' 'monopoly,' 'drive out of business,' and the like. This looks very formidable, but in law, as well as in mathematics, it simplifies things very much to reduce them to their lowest terms. * * * Now, when reduced to its ultimate analysis, all that the retail dealers in this case have done is to form an association to protect themselves from sales by wholesale dealers or manufacturers directly to consumers or other non-dealers at points where a member of the association is engaged in retail business. The means adopted to effect this end are simply these: They agree among themselves that they will not deal with any wholesale dealer or manufacturer who sells directly to consumers not dealers at a point where a member of the association is doing business, and provide for notice being given to all their members whenever a wholesale dealer or manufacturer makes any such sale. That is the head and front of defendant's offense. * * * There was no element of fraud, coercion or intimidation, either towards plaintiff or the members of the association." The Court says that the compliance with the demand was entirely optional with the plaintiff. "The mere fact that the proposed acts of the defendants would have resulted in plaintiff's loss of gains and profits does not of itself render those acts unlawful. That depends on whether the acts are in themselves unlawful. 'Injury,' in its legal sense, means damage resulting from an unlawful act. Associations may be entered into, the object of which is to adopt measures that may tend to diminish the gains and profits of another, and yet, so far from being unlawful, they may be highly meritorious."

"The complainants proceed on the theory that they are entitled to protection in the legitimate exercise of their business; that the sending of the notices to wholesale dealers not to sell supplies to plumbers not members of the association,

under the penalty, expressed in some instances and implied
in others, of the withdrawal of the patronage of the mem-
bers of the association in case of a failure to comply, was
unlawful, because it was intended injuriously to affect the
plumbers not members of the association in the conduct of
their business, and must necessarily have that effect. It is
doubtless true, speaking generally, that no one has a right
intentionally to do an act with the intent to injure another in
his business. Injury, however, in its legal sense, means dam-
age resulting from a violation of a legal right. It is this vio-
lation of a legal right which renders the act wrongful in the
eye of the law and makes it actionable. If, therefore, there
is a legal excuse for the act, it is not wrongful, even though
damage may result from its performance. The cause and
excuse for the sending of the notices, it is evident, was a
selfish desire on the part of the members of the association
to rid themselves of the competition of those not members,
with a view of increasing the profits of their own business.
The question, then, resolves itself into this: Was the desire
to free themselves from competition a sufficient excuse in
legal contemplation for the sending of the notices? We think
the question must receive an affirmative answer. Competi-
tion, it has been said, is the life of trade. Every act done by
a trader for the purpose of diverting trade from a rival and
attracting it to himself is an act intentionally done, and, in
so far as it is successful, to the injury of the rival in his busi-
ness, since to that extent it lessens his gains and profits. To
hold such an act wrongful and illegal would be to stifle com-
petition." *Macauley v. Tierney*, 19 R. I., 255, 37 L. R. A.,
455. The Court refused to enjoin the defendants. It is
urged by counsel that the guilt of defendants does not involve
what they did, but what they conspired to do. If the defend-
ants had pleaded to the first count in the bill without calling
for a bill of particulars, they would have gone to the jury on

the general issue of traverse to the bill. When, however, the State files its bill of particulars, which, for the purpose of the trial, is as if the means had been set out in the original bill of indictment, the question is presented whether, either in respect to the purpose of the conspiracy or the means by which it was to be accomplished, any crime is charged. If no crime is charged there is nothing for the jury to pass upon. The Court will either, upon motion, quash the indictment, or, as it did in *Com. v. Hunt, supra,* arrest the judgment. We are of the opinion that a conspiracy to injure ones business is not *per se* indictable. Do the means set out make it so? This brings us to consider the acts done by the defendants. Three of them, on January 13, 1904, went together to the prosecutor's place of business and notified him that he could not be considered in sympathy with organized labor unless he kept constantly employed union men. Certainly the number of the defendants was not so large as to intimidate him, and there is no suggestion that their manner was either offensive, violent or even discourteous. As we have seen, organized labor, or labor organizations, are not unlawful. The prosecutor had no legal right to demand that he should be considered in sympathy with organized labor; therefore he was not to be deprived of any legal right if he preferred to employ non-union men, and the defendant had an equal right to consider him unsympathetic with organized labor if he exercised such right. Suppose the same number of persons, being members of the anti-saloon league, should go to a merchant's store and notify him that he would not be considered in sympathy with the temperance cause if he employed clerks who did not belong to the league. If he continued to employ such clerks he was simply considered as unsympathetic with the cause. We fail to see any difference in principle between the act of the defendants and the case supposed. They notified him that he would not be considered

136——42

in sympathy with organized labor if he kept in his employment non-union men, although he was then under contract with non-union men for a year in advance. It is intended, we assume, in this item to charge that the defendants conspired to compel the prosecutor to break his contract with non-union men and discharge them. It will be noted that it is nowhere charged that such was the purpose of the defendants. Not a word is said capable of that construction. Certainly nothing should be left to conjecture. To what extent a conspiracy to induce men to violate their contracts is criminal is not clear. We are not required to discuss or decide it here. There is no complaint that the conduct of the defendants was intended to injure non-union men. This case has no such element in it, and we do not wish to be understood as expressing any opinion in regard to it. The question has been before other courts. There is a painful absence of harmony in the decisions. Suppose, however, that it be conceded that the defendants did notify the prosecutor that unless he discharged non-union men with whom he had contracted, etc., what was to be the result to him if he refused? He was to be considered as unsympathetic with union labor. This falls far short of intimidation or coercion. It will be noted that there is no charge that these defendants were members of any secret or other organization, or that they had the power or threatened to control the conduct of large numbers of men. It is said that they, "together with other evil-disposed persons, conspired," etc. Who "the other evil-disposed persons" are, what, if any, relation they bear to the defendants, is not stated. This alleged conspiracy is confined to the five defendants. When informed by the prosecutor that he would not discharge any non-union men with whom he had contracted, and that he would not agree to employ only union men in his business, the defendants "went away" and "in furtherance of the said conspiracy did actually" publish and cause to be pub-

lished the aforesaid notice, etc. : "Action of Carpenters and Joiners.—At a meeting of the carpenters held last evening, for his attitude towards organized labor Mr. C. A. Rice was declared unfair, and so listed, and that no union carpenters would work any material from his shop after February 15, 1904." The counsel for the prosecutor, in their brief, say: "It is perfectly true that defendants had a right to refuse to work material from Rice's shop. That they had a right to put him on their unfair list." The criminality, they say, consists in the intent or purpose with which these things are done; this, they say, is a question for the jury. It is not easy to see how it is a question for the jury, when the defendants admit the purpose, etc. If that which they did is lawful—if they had a perfect legal right to do it—we are unable to perceive how the publication renders it unlawful. We are not aware of any principle of law which makes it criminal to publish that a person has done an act which he had a perfect legal right to do, or that a person intends to pursue a course of conduct which he has a legal right to pursue. *Judge Holmes* says: "As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do—that is, giving warning of your intention to do in that event, and thus allow the other person the chance of avoiding the consequences, so as to 'compulsion' it depends upon how you 'compel.' " *Parker, C. J.,* in *Nat. Protec. Ap. v. Cumming,* 170 N. Y., 315, says: "A labor organization is endowed with precisely the same legal right as an individual to threaten to do that which it may lawfully do." "If an act be lawful—that is, one which a person has a legal right to do—the fact that he may in doing it be actuated by an improper motive, does not render it unlawful." *Bohen Mfg. Co. v. Hollis, supra.* It being properly conceded that it was not unlawful—that is, for the purpose of this discussion, criminal—for the defendants to declare Mr. Rice "unfair"

and to refuse to work his material, we can find nothing criminal in the publication made of their opinion or purpose. Does the fact that the defendants intended to induce persons who might otherwise purchase material from Mr. Rice to refrain from doing so make their conduct unlawful? This brings us back to the original questions. Persons who might wish to buy material from Mr. Rice had no legal claim on the services of the defendants—they were under no obligation to work the material purchased from him—therefore, in saying that they would not do so they deprived such persons of no legal right. They could not have maintained an action for damages against the defendants for refusing to work such material or for saying so. How, then, in a legal sense, can he be said to be injured. It is said that the purpose of the defendants in making the publication was to induce persons to refrain from purchasing material for fear of incurring the ill-will of the defendants. This certainly is not unlawful. *Bowen v. Matheson,* 96 Mass., 499. If courts were to maintain actions upon such grounds, society would soon be converted into an array of hostile litigants. As is well said by *Judge Black* in *Jenkins v. Fowler,* 24 Penn., 308: "Malicious motives make a bad act worse, but they cannot make that wrong which in its own essence is lawful. * * * Any transaction which would be lawful and proper if the parties are friends cannot be made the foundation of an action merely because they happen to be enemies As long as a man keeps himself within the law by doing no act which violates, we must leave his motive to Him who searches the heart."

In *Heywood v. Tillson,* 75 Me., 225, it is said: "To entitle the plaintiff to recover there must be a wrong done. No one is a wrong-doer but he who does what the law does not allow. He who does what the law allows cannot be a wrong-doer, whatever his motive." "The exercise of a legal right cannot be a legal wrong to another." Cooley on Torts, 65; *Cotterell*

STATE *v.* VAN PELT.

*v. Jones,* 73 E. C. L., 713. In *Hunt v. Simonds,* 19 Mo., 583, it is said: "The act charged upon the defendants as having been done by preconcert was an act which each and every one of the defendants had a right to do, and was no violation of any right which the plaintiff could claim under the law. He had no right to demand insurance upon his boat from any or all of the defendants, nor that they should insure cargo upon his boat, and consequently their refusal to insure, from any motive, however improper, could give him no right to sue them. The moment it is established that the conspiracy is not a substantial ground of action, it follows that no action can be brought to recover damages for the joint act of several unless the right itself is alleged." The case of *Payne v. W. & A. Railroad,* 13 Lea, 507, 49 Am. Rep., 666, illustrates the principle as seen from the other viewpoint. The agent of the railroad caused to be posted by the yard-master a notice in these words: "Any employee in this company on Chattanooga pay-roll who trades with L. Payne from this date will be discharged. Notify men in your department." The plaintiff alleged that he was a merchant, having a large trade with the employees and others; that the act of the defendant was malicious, etc. The defendant demurred. The Court sustained the demurrer in an able opinion, holding that as the act was not unlawful the motive with which it was done did not give a cause of action. The Judge said that any other doctrine would lead to evils innumerable. "It would be incredible that our courts of law should be perverted to the trial of the motives of men who confessedly had done no unlawful act. It is suggestive of the days of constructive treason." *Phelps v. Nowlen,* 72 N. Y., 39. In *Richardson v. Railroad,* 126 N. C., 100, *Clark, J.,* says: "But upon the plaintiff's own showing, his discharge was within the right of the defendant and not wrongful, and malice disconnected with the infringement of a legal right cannot be the subject

of an action." The principle is well stated by *Bowen, L. J.,* in *Mogul Steamship Co. v. McGregor,* 23 Q. B. D., 612; "We were invited by plaintiff's counsel to accept the position from which their argument started—that an action will lie if a man maliciously and wrongfully conducts himself so as to injure another in that others trade. Obscurity resides in the language used to state this proposition. The terms 'maliciously,' 'wrongfully' and 'injure' are words all of which have accurate meanings, well known to the law, but which also have popular and less precise signification, into which it is necessary to see that the argument does not slide. An intent to 'injure,' in strictness, means more than an intent to harm. It connotes an intent to do wrongful harm. 'Maliciously,' in like manner, means and implies an intention to do an act which is wrongful to the detriment of another. The term 'wrongful' imports in its term the infringement of some right." The question as applied to a disturbance of relations between an employer and employed underwent a most exhaustive examination in *Allen v. Flood,* L. R. A. C., 1, in which the conclusion was reached that "an act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer liable." In the later case of *Quinn v. Leathem,* L. R. A. C. (1901), the same question with some modifying facts was discussed. The reporter says: "*Allen v. Flood* explained and its real effect stated." An interesting discussion of the question may be found in the Law Quar. Rev., January, 1904. Without undertaking to mark the limitations or exceptions to the general principle, we are of the opinion that the defendant's conduct was not unlawful. That the motive prompting them does not change or affect its legal quality. It is not to be doubted that many acts which subject a party to a civil action, without regard to the motive with which they are committed, are indictable either by the common law or by statute by reason of the mo-

tive which prompts them. To kill a man's horse is actionable; to do so maliciously is indictable. The act itself is a legal injury. The statute makes it a crime when malice is the moving cause. Many other instances readily occur to the mind. We think that it will be found that in every case where the act is criminal there is a trespass on some legal right or a legal wrong done to the complaining person. We concur with his Honor that no criminal act is charged in the indictment. We have not overlooked the cases cited in the briefs. The courts are very far from agreement in regard to the law of conspiracy. This fact tends to show the danger of giving to the word "unlawful" a broad and all-embracing meaning in the definition of a criminal conspiracy. We are told this is a case of great importance. It is said: "We are now at the parting of the ways. It is safe to predict that there will be no more criminal conspiracies, no more demands for union shops and no strikes, sympathetic or otherwise, in this State, if the Court sustains the bill in this case." We are also told by counsel that it rests upon the members of this Court to decide whether labor and capital * * * shall dwell together in peace and unity, controlled by the law, etc. It is desirable that this condition, which has always so happily prevailed in this State, shall be preserved. We are duly sensible of our duty, as Judges, to so declare the law as to secure as far as the law may this condition. As we have endeavored to show, concerted action and association to protect common interests and promote common advantage is not peculiar to those whose capital consists in their labor. The security of the State demands that the same principles of law must apply to all sorts and conditions of men. It is well to consider how far liberty of thought and action may be restricted by a resort to the "loose expressions" and dangerously uncertain definitions of this crime affecting the liberty of the citizens.

It is very doubtful whether industrial conditions, or relations between employers and employees, have been improved by prosecutions for criminal conspiracy. As we have seen, in England the subject has received the most careful attention of enlightened statesmen, resulting in the passage of wise statutes. It is asked, May not a man conduct his business in his own way? And undoubtedly he may. For any unlawful interference with this right he has a remedy, either civil or criminal, as such interference may justify. The question is asked, May not men organize to promote their common interests, and when such interests conflict with other interests resort to lawful and peaceful means to secure the best results? It is clear that they may. Where, then, is the line which separates conduct which is lawful from that which is unlawful? The answer comes from *Chief Justice Shaw,* one of the wisest and most learned of American jurists. "If it is to be carried into effect by fair or honorable or lawful means, it is, to say the least, innocent. If by falsehood or force, it may be stamped with the character of a criminal conspiracy." We would not be misunderstood. Capital, either in the form of money or other property, or in the form of skill, experience, intelligence and strength, may combine for lawful purpose. When in either form, or under whatever guise it seeks or conspires to effectuate its purpose, however lawful, by means of violence to person or property, or by fraud or other criminal means, or when by such means it conspires to prevent any person from conducting his own business in his own way, or from employing such persons as he may prefer, or by preventing any person from being employed at such wages or upon such terms as he may prefer, the courts will be prompt to declare and firm to administer the law to punish the guilty and protect the injured. What acts will constitute such unlawful means it is impossible to define. As all other ques-

tions arising out of the struggle of political, social or industrial forces, they must be decided as they are presented.

We have refrained from using terms having a popular but as yet indefinite legal meaning. The word "boycott," by reason of the circumstances under which it originated and the extent to which the means used to accomplish the purpose of the parties engaged in it were carried, is commonly supposed to involve unlawful means. The word is defined in Black's Law Dictionary, p. 150, as follows: "In criminal law. A conspiracy formed and intended directly or indirectly to prevent the carrying on of any lawful business, or to injure the business of any one by wrongfully preventing those who would be customers from buying from or employing the representatives of said business by threats, intimidation, or other forcible means." In *Brace v. Evans,* 3rd R. Y. Corp. Law J., 561, it is said: "The word in itself implies a threat in popular acceptation, it is an organized effect to exclude a person from business relations with others by persuasion, intimidation and other acts which tend to violence and have coerced him through fear of his own injury to submit to dictation in the management of his affairs." In *Matthews v. Shankland,* 56 N. Y. Supp., 123, the term is held to come within the statutory definition of an "unlawful conspiracy." For history of the word and definition as adopted by many courts, see "Words and Phrases," Vol. 1, page 855. We find nothing in the charge in this case which brings the purpose or conduct of the defendant within such definition. Much obscurity and uncertainty has originated in the careless use of the terms of this character.

Mutual confidence, forbearance, patience and concession, accompanied by a free, frank interchange of thought and feeling, will do more to perpetuate the kindly relations existing among us with our homogeneous population than prosecutions for criminal conspiracies, when no criminal or unlaw-

ful elements exist.   In view of the wide divergence of judicial opinion, by reason whereof the law is oppressed with a distressing uncertainty, it would seem that the Legislature should abrogate the common law on the subject and enact a plain, clearly expressed and carefully guarded statute in lieu thereof.   We think it also proper to say in the discussion of this case, we do not mean to suggest that Mr. Rice is unfair to his employees.   We have considered the appeal in its legal aspects as presented by the record.   His Honor's judgment quashing the indictment must be

Affirmed.

CLARK, C. J., concurring.   As stated in the opinion in chief "the sufficiency of the first count in the bill is not called in question, as filing the bill of particulars makes sufficiently definite the charge and means by which the alleged conspiracy was to be put into execution.   *   *   *   The Solicitor filed a bill of particulars, and the State is confined 'to the items therein set down.' "   Bishop Cr. Pro., 643.   Those items are in substance (1) that pursuant to a previous agreement three of the defendants at the time charged went to the prosecutor's place of business and notified him that he could not be considered in sympathy with organized labor unless he employed none but union men; (2) nor if he retained non-union men, notwithstanding he had already contracted with some as much as a year in advance; (3) that upon the prosecutor's refusal to discharge the non-union men with whom he had already contracted and whose time had not expired, and would not agree to employ only union men in his business, the defendants published in a local newspaper that, at a meeting of the carpenters and joiners to consider the attitude of the prosecutor towards organized labor, he was "declared unfair and so listed, and that no union carpenter would work any material from his shop after 15 February, 1904."   It

was charged that the defendants conspired to do this with intent to injure the prosecutor in his business by causing other persons to refrain from buying lumber and material from the prosecutor, for fear of the ill-will of the defendants, and also lest they might be subjected to delay and inconvenience by reason of the refusal of the defendants and others to work upon material purchased from the prosecutor.

A criminal conspiracy is defined to be, "An agreement of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." No act charged above, nor any of the means set out 'in the bill of particulars, is unlawful, and the charge of intent is immaterial unless the act or the means used were unlawful. It was not unlawful for the carpenters' union to try to induce the prosecutor to employ none but members of their union, neither illegal threats nor violence or other unlawful means being used; nor was it forbidden by any law to publish the fact of his refusal and to ask those friendly to their organization not to patronize him. Whether such publication would reduce or increase the prosecutor's business would depend entirely upon the public, and whether a majority of those dealing with one in the prosecutor's business preferred the union or non-union system. The State was restricted to the items set forth in the bill of particulars, and there being no unlawful act alleged therein, nor unlawful means to do a lawful act, the bill was properly quashed. This matter is fully discussed and thus held by *Parker, C. J.,* in *Protective Assn. v. Cumming,* 170 New York, 313.

There is no exception to the means being furnished by a bill of particulars, but it may be well to note it is well settled that in indictments for conspiracy, barratry, assault and battery, nuisance and some other offenses, it is sufficient if the illegal act is charged, and the means need not be charged. In *Aikens v. Wisconsin,* U. S. Supreme Court, 7 November, 1904, it is said "the very plot is an action in itself," citing

*Mulcady v. Queen,* T. R. 3 H. L., 317. The means are never charged in most if not all other offenses, for instance, in murder, burglary, rape, arson and indeed nearly all crimes, yet as to conspiracy and others above named a bill of particulars as to the means may be, and usually will be, ordered by the Court to furnish information to the defendant. In *State v. Brady,* 107 N. C., 824, which was an indictment for conspiracy, it was held, citing the English cases, that an illegal conspiracy being indictable, though no act be done in pursuance thereof, the means need not be charged. It is enough if the conspiracy is charged to do an act, which act the Court can see is unlawful, but the Court would order a bill of particulars, if asked. The Court quotes, among other cases, from *Goersen v. Com.,* 99 Pa. St., 398, which was an indictment for murder: "The nature and cause of a criminal prosecution are sufficiently averred by charging the crime alleged to have been committed. This must be done. The mode or manner refers to the instrument with which it was committed, or the specific agency used to accomplish the result. It is not necessary to aver either of these in the indictment. Whenever one, before trial, needs more specific information than is contained in the indictment to enable him to make a just defense, it may be obtained on proper application to the Court." This Court then goes on (*State v. Brady, supra*) to state the practice as to applications for bills of particulars, and adds: "This practice is much favored, because no demurrer or motion to quash lies to a bill of particulars, but if an insufficient bill is furnished the Court will order a fuller statement of particulars to be furnished."

The object of the law is not to require technical refinements in indictments that guilty men may escape punishment, but to dispense with them that criminal cases may be tried upon the facts and the truth of the charge ascertained. The

object of·the indictment is simply to give the defendant notice
of the crime with which he is charged.  If he needs informa-
tion as to the means by which the State will seek to prove
that he committed the crime, the Court will order a bill of
particulars, and if the one furnished is not sufficient will
order another and another.  *State v. Brady* has been cited and
approved on this point in *State v. Gates* (indictment for per-
jury), 107 N. C., 832; *State v. Dunn* (resisting an officer),
109 N. C., 840; *Avery, J.,* in *State v. Bryant* (destroying
line trees), 111 N. C., 694; *Avery, J.,* in *State v. Shade*
(secret assault), 115 N. C., 758; *Townsend v. Williams,* 117
N. C., 337; *Montgomery, J.,* in *State v. Pickett* (resisting
officer), 118 N. C., 1233, and in the *Gold Brick case (State
v. Howard),* 129 N. C., 657, in which last many authorities
elsewhere are cited and our ruling re-affirmed that in indict-
ments for conspiracy to do an unlawful act the means being
mere matters of evidence need not be charged in the indict-
ment, but that a bill of particulars will be ordered for informa-
tion of the defendant, if applied for.  In *State v. Brady* this·
Court cites with approval from Wright on Criminal Con-
spiracy, 189, 191, that "If unexecuted, the means cannot be
stated; if executed, the means employed are but evidence of
the offense or an aggravation of it,   *   *   *   for the crime
of conspiracy consists of the *conspiracy* and not of the execu-
tion of it," *i. e.,* the agreement to do an unlawful act.  In the
present case the act agreed to be done, the publication afore-
said, was not an unlawful act.

The practice is uniform in all jurisdictions.  In 2 McClain
Cr. Law, secs. 966, 976, 977, it is said that it is not necessary
to charge anything as done.  "A conspiracy to do an unlaw-
ful act is a separate and distinct offense from that of the act
itself, and is to be governed in its prosecution by the pro-
visions relating to conspiracies and not those relating to the
specific offense, citing *Com. v. McHale,* 97 Pa. St., 397; but

that the Court will order a bill of particulars to give the de-
fendant all necessary information, citing numerous cases,
among them upon the last point *Rex v. Hamilton,* 7 C. & P.,
448; *Reg. v. Rycroft,* 6 Cox, 76; *Reg. v. Esdaile,* 1 F. & F.,
213; *Com. v. Meserve,* 154 Mass., 64. To the same effect
(in embezzlement) *Rex v. Hodgson,* 3 C. & P., 422, and *Rex
v. Bootyman,* 5 C. & P., 300. The law and practice seem
uniform, and is thus summed up by *Dr. Wharton* in his ad-
mirable work on Pleading and Practice, sec. 702, with abun-
dant citation of authorities: "It is allowable to indict a man
as a common barrator, or as a common seller of intoxicating
liquors, or assaulting a person unknown, or as conspiring
with persons unknown to cheat and defraud the prosecutor
by 'divers false tokens and pretenses,' and in none of these
cases is the allegation of time material, so that the defendant
is obliged to meet a charge of an offense comparatively un-
designated, committed at a time which is not designated at all.
Hence has arisen the practice of requiring in such cases bills
of particulars; and the adoption of such bills instead of the
exacting of increased particularity in indictments is produc-
tive of several advantages. It prevents much cumbrous
special pleading, and consequently failure of justice, as no
demurrer lies to bills of particulars. And it gives the de-
fendant, in plain, unartificial language, notice of the charge
he has to meet." The same statement as to the law is made
in 1 Bishop New Crim. Proc., sec. 644, (2) with the same
reason that a bill of particulars "enables the defendant on
the one hand fairly to defend himself, and on the other hand
not fettering the prosecution." In 2 Bishop New Crim.
Proc., sec. 208, it is said as to conspiracy: "As agreed means
are not essential to the offense, it would be a perversion of
justice to require the prosecuting power to allege them"; and
in section 209 he says that as to conspiracy, assault and bat-
tery, barratry, common scolds and some others, "they may be

charged in as few words" as possible, adding that where further information as to the means, which are mere evidential matters, should be given the defendant, the Court will order a bill of particulars. The courts all seem to adopt the same rule and for the same reason. It was held that a bill of particulars was the remedy on an indictment for adultery. *People v. Davis,* 52 Mich., 569. It was recognized as the settled practice in indictments for nuisance (*State v. Hill,* 13 R. I., 314) ; in indictments for perjury (*Williams v. Com.,* 91 Pa. St., 493) ; in indictments for murder (*Goerson v. Com.,* 99 Pa. St., 388). In short, in all cases where information as to the means is necessary to the defendant it will be given him by a bill of particulars, but these need not be set out in the indictment, which is required only to charge the offense, which in conspiracy is the "conspiring" to do an illegal act. Hence the act must be charged, but not the means, which are merely evidential and which cannot be known, as often none are resorted to—the "conspiracy," not the perpetration of a substantive offense, being the charge. In an ancient case in Massachusetts (*Com. v. Hunt,* 45 Mass., 111), *Shaw, C. J.,* did say that in cases where the conspiracy charged was not to do an unlawful act, but to resort to unlawful means to do a lawful act, the means should be charged. But this does not conflict with the above authorities, for the unlawful act conspired to be done must be charged, and when the unlawfulness is the unlawful acts to be done to effect a lawful purpose, of course such unlawful acts must be charged. And in a much more recent case in Massachusetts (*Com. v. Meserve,* 154 Mass., 72, 73, 1891), that learned Court re-affirmed the universal doctrine above laid down that the means need not be charged in an indictment for conspiracy, but that information will be given by a bill of particulars, and cites *Com. v. Hunt, supra,* as authority that such information should be in the indictment only when "the purpose of the conspiracy itself does not appear to be criminal or unlawful."

The practice as to setting out evidential matters in bills of particulars is a wise one, observed in the English as well as the American courts, and has been held by all the authorities here, as elsewhere, and has been reaffirmed by us as recently as the *Gold Brick case,* 129 N. C., 657.

The whole matter is well summed up in the Star Route case (*U. S. v. Dorsey,* 40 Fed. Rep., 752), which holds, citing *U. S. v. Cruikshank,* 92 U. S., 564, that if an indictment for conspiracy charges that the object was to commit a crime or unlawful act, the means being evidential need not be set forth in the indictment, and information, if desired by the' defendant, may be given him by a bill of particulars; but where the conspiracy is to use unlawful means to do a lawful act, then the means is the unlawful object to be effected by the conspiracy and must be charged in the indictment. Indeed, the definition of criminal conspiracy, "An agreement of two or more to do an unlawful act, or to do a lawful act by unlawful means," might be properly shortened by omitting the latter half, for where the conspiracy is to resort to unlawful means to secure the lawful end, such unlawful means is the unlawful act which the conspiracy contemplates, and should be charged, that the Court may see, as a matter of law, that an offense is charged.

Bills of particulars are not peculiar to indictments for conspiracy, but are allowed as to all offenses, and in civil cases also. The Code, sec. 259. They are for the benefit of defendants desiring information as to evidential matters which are not required to be set out in an indictment or complaint. The practice is just the opposite of "general warrants" or "informations." No good pleading ever requires matters of evidence to be set out, and this is simply a benevolent practice recognized by all courts, and our statute as well, to furnish the defendants information, if applied for, to assist in preparing the defense.

DOUGLAS, J., concurring.   I concur in the admirable opinion of the Court upon well-settled rules of law as well as the highest principles of public policy and natural right.   I can add nothing thereto beyond what has been said in my dissenting opinion in *State v. Howard,* 129 N. C., 663.   In that case I used the following language: "I do not suppose that any one will deny that the indictment of Parnell was purely for political reasons; and if the English rule prevails in this State, what is there to prevent the indictment of the members of our usual labor organizations?"   What I then foresaw has come to pass; and it needs not a prophet's vision to foresee the vast potentialities of evil that would attend the decision of this Court were it other than it is.

We are assured that if we break up the labor organizations there will be no more strikes, and that peace and order will reign throughout the land.   When Kosciusko fell and Poland lay once more beneath the Cossack's heel, Sebastiani announced that "Order reigns in Warsaw"; while Louis Napoleon, in seizing the throne of France, declared that "The Empire is peace."   North Carolinians seek not the peace of despotism, but that peace alone which follows the mutual recognition of equal rights and the impartial enforcement of just and equal laws.